**UNITED STATES of America, Plaintiff,**

v.

**Eugene E. EVANS, Defendant.**

**Crim. No. 1062-60.**

United States District Court
District of Columbia.

May 9, 1961.

Harold H. Titus, Jr., Asst. U. S. Atty. (Oliver Gasch, U. S. Atty. at the time of argument), Washington, D. C., for plaintiff.

Richard M. Coleman (appointed by the Court), Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

Defendant, charged in five counts with larceny and housebreaking, has moved prior to trial to suppress as evidence against him certain property taken by the police from his apartment.

In the view which the Court takes of this case, the following undisputed facts and testimony are relevant: On August 26, November 23, and November 26, 1960, three separate robberies took place in the District of Columbia. Taken in the first were some sweaters, some other clothing, and two suitcases. Taken in the second, which victimized Mitchel's

Sport Shop, were a sewing machine and table, and assorted types of athletic outfits. The third yielded a television set. Each occurrence, including a description of the missing property, was reported separately to the police.

On November 25, two days after the Sport Shop incident, the police received a call from an unidentified woman, inquiring whether they had a report that a sewing machine had been stolen, and informing them that if they did, they might search for Eugene Evans who lived at 1401 Girard Street, and who, said the caller, had possession of a stolen sewing machine. The informant, as she later admitted at the hearing of this motion, was the defendant's wife; her secret call to the police followed an argument between the couple.

On December 1, Police Detective Talbot, who as indicated, had previously learned the type of equipment taken from Mitchel's Sport Shop, was told by a "reliable informant * * * that he had been approached by [Eugene] Evans to sell him some warm-up jackets and athletic shirts." [Tr. 85]. The next day, Detective Talbot, accompanied by Detective Knotts, went to the Sport Shop. The officers spoke with the owner, Mitchel Sklar, learned that he did not know Eugene Evans, and were shown tables and sewing machines of the type stolen. They were also asked by Mr. Sklar whether

> "They had received any information on this [disappearance of the sewing machine and table], whether they had gotten it back or not. They said they didn't, but they were looking at it and had some information that they might be able to return it to me." [Tr. 125]

At the conclusion of this conversation, Detective Talbot "asked him [Mr. Sklar] to accompany us over to the [defendant's] apartment." [Tr. 86]

Thus, at about 1:30 p. m. on December 2, possessed of the above information and knowing, moreover, that defendant's apartment was approximately 100 feet from the Sport Shop—but without warrants either for arrest or for search and seizure—this group of two officers, in plain-clothes, and Mr. Sklar, went to defendant's apartment in the basement of 1401 Girard Street.

There is considerable dispute in the testimony over the announcement the police made which caused defendant to open a hallway door (door "A")—whether they said "police" or asked for the janitor [defendant was not the janitor]; over the exact conversation which occurred at the door after it was opened and Detective Talbot showed a badge to defendant—whether defendant said, as testified by the Detective and Mr. Sklar, words similar to "come in" or "come back this way"; over the question of whether the corridor behind door "A" was a part of defendant's home for Fourth Amendment purposes; over the exact moment after the group's arrival at door "B" [halfway down the corridor behind door "A", and opening directly into defendant's living room] some of the items reported stolen were spotted by the police and Mr. Sklar; over the exact time at which Detective Talbot formally told defendant that he was under arrest—whether it occurred on the threshold of door "B" or after part of the ensuing search of the three rooms of the apartment and of the closet of one of them had been completed; and over the length of time the search took. There is no dispute that a search without a warrant occurred and that the items sought to be suppressed—the fruits of the three robberies—were seized.[1]

The Government contends that the seizure was justified because "incident to a lawful arrest"; the defendant argues that regardless of the lawfulness of the arrest, the seizure was invalid because (a) the testimony of Detective Talbot and Mr. Sklar reveals that the purpose of the

---

1. There were actually two searches and seizures of defendant's apartment on December 2: that detailed here, and one several hours later—also without a warrant. All goods seized at either time are here suppressed.

visit to his apartment was to conduct a search and thus the arrest was "incident" to the search rather than vice versa; (b) he did not consent to such a search; and (c) there were no "exceptional circumstances" to justify making the search without a warrant.

The Court agrees with each of defendant's contentions and reads the applicable case law interpreting the Fourth Amendment's guarantee that

> "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"

to require suppression of the controverted evidence without resolution of the disputed points outlined above.

■ (a) Although the Government contends that the two plain-clothes men and the complaining witness went to defendant's apartment to "talk with him" about the reports of his possible involvement in these three robberies so that his arrest, if he were innocent, could be avoided, the Court concludes, after a careful review of the record and balancing the inferences which could be drawn therefrom, that the purpose of the visit was to make, if possible, the kind of search and seizure which ensued. That the officers told Mr. Sklar, on being asked whether they had any hope for recovery of his missing goods, that they "had some information that they might be able to return it to me"; that they had Mr. Sklar show them tables of the type missing; that they brought Mr. Sklar with them to defendant's apartment; and that they began searching immediately upon entering the apartment all support this conclusion.

■ (b) The Government's further contention that even if the officers intended to search the apartment, defendant consented to the search, and thus waived any right to complain that it violated the Fourth Amendment, is not supported either by the facts or by the applicable case law.

First, even if defendant's invitation to "come on in" was made, it was in response only to an indication that the visit's purpose was talk—not search.

Second, even if an invitation for talk could be construed (in circumstances other than those involving suspects and police) as an invitation for other consequences, the cases in the Court of Appeals and the Supreme Court clearly hold that

> "[w]ords or acts that would show consent in some circumstances do not show it in others. 'Non-resistance to the orders or suggestions of the police is not infrequent * * *; true consent, free of fear or pressure, is not so readily to be found.' [citation omitted]. * * * no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered. It follows that when police identify themselves as such, search a room, and find contraband in it, the occupant's words or signs of acquiescence in the search, accompanied by a denial of guilt, do not show consent; at least in the absence of some extraordinary circumstance such as ignorance that contraband is present."

Higgins v. United States, 1954, 93 U.S. App.D.C. 340, 341, 209 F.2d 819, 820. See also Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Lee v. United States, 1956, 98 U.S.App. D.C. 97, 98, 232 F.2d 354.

(c) Thus the purpose of the officers' visit having been to search the defendant's apartment (so that the arrest made was incident thereto), and no consent having been given, the search can be justified only if there were "exceptional circumstances" which rendered impossible police application to a dispassionate magistrate for issuance of a warrant—as the Supreme Court recently and strongly reiterated in Chapman v. United States, 81 S.Ct. 776. See also Lee v. United States,

supra, and c.f. Johnson v. United States, supra.

None of the exceptional circumstances recognized by the cases cited—goods sought in a moving vehicle or in danger of destruction, suspect likely or able to flee—was present here. This being so, the search without a warrant was unreasonable.

The Government's contention that the officers lacked probable cause to seek a warrant until they were sure that the property was in the apartment—made in connection with its argument that the purpose of the visit was talk and not search—does not excuse the search; it is further reason for regretting that the search occurred. Nor can the Government argue that conditions constituting "exceptional circumstances" were created once defendant knew the police were aware of his possession of the property; the police created these circumstances by entering defendant's home without a warrant. In any event, had the police sought a warrant, they still could have prevented defendant's flight or his destruction of the goods (a most remote possibility in view of their bulk) by placing men outside the door of the apartment.[2] See United States v. Jeffers, 1951, 342 U.S. 48, 52, 72 S.Ct. 93, 96 L.Ed. 59.

In here striking down a search and seizure without a warrant, and upholding the constitutional requirement that the key to invasion of the home be a magistrate's order rather than an investigating officer's desire, the Court should not be understood as holding that the police may never go to a home and ask to speak with a suspect about rumors of his involvement in a crime; the holding here condemns only their going with the intention of making a search. The present fact-situation not being one in which a searchless home visit is presented, the Court can only say generally that such a visit appears to be a reasonable way in which police can conduct the pre-arrest investigative process, and at the same time give to innocent suspects the opportunity to clear themselves; but the Court must also say that such a method of police activity, like "inviting" "suspects" to appear for questioning at police headquarters, is one which must always be open to judicial scrutiny of claimed police abuses.

An order is filed herewith reflecting the above opinion and suppressing as evidence in this case any and all property seized from defendant's premises on December 2, 1960.[3]

2. To have required a warrant in this situation would not have been an empty formality; it would have described with particularity the articles to be seized and might have limited the number of searches to one.

3. Because the defendant's motion asked only for suppression of the evidence *seized*, the Court expresses no opinion on whether, at trial of this case, the officers or Mr. Sklar may testify that they *saw* any or all of these articles in defendant's apartment at time of the seizure.