David T. Gibbons, J.
By indictment dated December 22,1970, the Grand Jury of Nassau County charged the defendants with the crimes of criminal possession of a dangerous drug in the third degree, involving marijuana and hashish under the first *452 count; criminal possession of a dangerous drug in the fourth degree, involving cocaine and heroin under the second count; criminal possession of a dangerous drug in the sixth degree, involving methamphetamine under the third count; and possession of a weapon, dangerous instrument and appliance, as a misdemeanor involving a pistol loaded with ammunition, under the fourth count.
A combined pretrial hearing was had for an order pursuant to article 710 of the Criminal Procedure Law, to (1) suppress certain physical evidence from use upon the trial herein upon the ground that the same was seized as a result of an unreasonable search and seizure in violation of the defendant’s constitutional right under the Fourth Amendment (Mapp v. Ohio, 367 U. S. 643); and (2) to determine the admissibility on the trial hereof of certain statements allegedly made by the defendant to law enforcement officers, as measured by the guidelines of Miranda v. Arizona (384 U. S. 436) and as to voluntariness under the standards of Jackson v. Denno (378 U. S. 368), People v. Huntley (15 N Y 2d 72) and Criminal Procedure Law 60.45.
The defendant, Tyler Somas, stipulated that this combined hearing be conducted without the presence of the codefendant Faye C. Oleare, who did not appear when this matter was called, and whose whereabouts are unknown to the court.
The court makes the following findings of fact and conclusions of law.
While on motor patrol in the evening of November 7, 1970, Patrolman Robert McReynolds was ordered to investigate a complaint regarding abandoned automobiles in the vicinity of 24 Max Avenue, Hicksville, New York. The building located at that address contains two factory establishments and an apartment on the first floor.
In the course of this investigation, the patrolman knocked on the front door of the apartment at about 9:15 that evening. In response he heard the voice of a very young child whom he later ascertained to be two years of age. He asked through the door, “ Is your father or mother home? ”. The child answered in the negative. He then again asked whether anyone else was home, and again the child replied, “ No ”. The door was not opened. It was locked. He peered through the curtained window and saw the lights on and a television set in operation.
At this point the police officer made a radio call for assistance from the Juvenile Aid Bureau of the Nassau County Police Department. Following this call, Detective Looney of the Juve *453 nile Aid Bureau, and Sergeant Carey and Patrolman Carlson, operating a police ambulance, convened at the premises.
Patrolman McReynolds, along with Sergeant Carey and Patrolman Carlson, approached the apartment. Patrolman McReynolds knocked on the door, and on this occasion, a different young voice answered. The patrolman requested the child to open the door. The door was opened and he was met by a five-year-old female.
The police officer questioned the little girl as to the whereabouts of her parents. She told him that there was no one else in the apartment besides the' two children. The officer ascertained at that time that the young girl was five years old, and that the child who first answered his knocking was a little boy two years of age.
In the course of being questioned, the young girl admired the service revolver belonging to Patrolman Carlson and said, “ Tyler has a gun like that ”. The girl then turned around and walked over to a cabinet and said, “ See, here it is ”. She had picked a loaded .38 caliber Smith & Wesson revolver out of the top drawer and the police officers immediately took the gun from her before anything happened. The police asked her, “ Has Tyler any more guns? ”, and she replied, “ Yes, he has a lot of guns and he also has pot and speed ’ ’. She then went back to the same drawer and picked out a plastic bag which contained marijuana and also gave it to the police officers.
The officers then proceeded to search the apartment for other guns and narcotics. They found another bag containing marijuana and several empty glassine bags, and full glassine bags, which seemed to contain heroin, in the drawer of the cabinet from which the child had retrieved the pistol and the first bag of marijuana.
As they proceeded through the apartment, which contained a foyer, living room, bedroom and kitchenette, they also found more marijuana in a carved bowl in open view on top of a cabinet which was located on the side of the room opposite the safe. It also contained several glassine bags containing what appeared to be heroin.
During the course of this hearing it was stipulated by counsel for the defendant that Patrolman McReynolds was qualified by virtue of training and experience as a policeman to recognize narcotics.
At 1:15 a.m., on November 8, 1970, Tyler Somas and Faye Oleare entered the apartment. The police introduced themselves and then Sergeant Carey asked them if they lived there, and they replied, “Yes, we do ”. Detective Staffer, who had *454 arrived in the apartment earlier at about 10 p.m., then stated to the defendants, “ Do you know your rights under the law? ”, and they replied, “Yes”. Detective Stalter then said, “I’ll tell you your rights anyway ’ ’, and proceeded to do so as follows: “You have the right to remain silent; you have the right to an attorney; if you cannot afford an attorney, one will be provided for you. Anything that you say may be used against you in court ”.
After the rights were stated by Stalter, the defendants said nothing. He then inforihed both defendants that they were under arrest, and put handcuffs on Tyler Somas.
Detective Stalter then asked to whom the marijuana belonged, and Tyler Somas said to Faye Oleare, “ Say the marijuana belongs to you, and I’ll go free and set bail for you”. Stalter then asked Tyler Somas to open the safe and he replied, “No, you need a search warrant”. Detective Stalter then said, “ Alright, we’ll take the safe and get a warrant ”. Tyler Somas then told Faye Oleare to open the safe, and she did so. Patrolman McBeynolds saw á large plastic bag containing two pounds of marijuana, as well as several boxes of ammunition, in the safe. Under a table in the corner of the room, in open view, there was a set of antique scales. They also found an old pepper box antique pistol hanging on the wall. It was stipulated by the People that this antique pistol will not be offered in evidence at the trial. There was no other conversation with the defendant, Tyler Somas.
The police thereafter learned that the children were Faye Oleare’s children, and she was not married to Tyler Somas. Lieutenant Looney of the Juvenile Aid Bureau had taken the two children to Meadowbrook Hospital at about 10 p.m. on November 7th.
Patrolman McBeynolds testified, and the court finds, that with respect to the 'complaint concerning the abandoned motor vehicles, he had been to 24 Max Avenue a week earlier, when he told Mr. Somas to remove the cars after he learned that they were Somas’ cars. He knew that abandoning a car was a violation of the Vehicle and Traffic Law and that this was not a crime. He knew of no crime being committed by the defendants prior to going to 24 Max Avenue and knocking on the door.
The decisive consideration in passing upon the instant matter is that, when Patrolman McBeynolds approached the apartment and knocked on the door, this was for no other purpose except to investigate the complaint pertaining to the . abandoned automobiles. It was not done in furtherance of an intention to conduct a search within the premises.
*455 As soon as he knocked on the door there unfolded before him the unusual circumstance of an oral response by a two-year-old child, from behind the closed door, to the effect that neither of the child’s parents, nor anyone else was at home. Taking into account that it was then 9:15 p.m., and darkness had already fallen; that it was a night in November when doors and windows are kept closed for the most part; and that this was all taking place in a building otherwise devoted to industrial pursuits, and where distant neighbors may not be alerted to calls for help, and, therefore, could render little aid in case of danger, the patrolman properly sensed that he was confronted with an emergency situation which called upon him to invoke certain measures for the protection of the children.
The general rule pertaining to the constitutional controls imposed upon a law enforcement officer’s right to invade a citizen’s privacy for the purpose of search and seizure is stated in People v. Loria (10 N Y 2d 368, 373) as follows: “ The Fourth Amendment, as noted, condemns only those searches and seizures which are unreasonable (Harris v. United States, 331 U. S. 145, 150). A search is reasonable if conducted pursuant to a legal search warrant, by consent, or incident to a lawful arrest ”.
The instant case, however, presents a different dimension of the question of when and under what circumstances a police officer may legally enter a private residence.
Where danger, or even the possibility of danger exists, the finely honed rule of probable cause, mandated by constitutional considerations, gives way to a rule of practical expediency which is demanded by the exigency of the conditions confronting the policeman.
This rule was expressed by Judge Warren E. Burger, now Chief Justice of the Supreme Court of the United States, in Wayne v. United States (318 F. 2d 205, 212 [1963], cert. den. 375 U. S. 860) as follows: “ Breaking into a home by force is not illegal if it is reasonable in the circumstances. * * * But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of ‘ dead bodies, ’ the police may find the ‘ bodies ’ to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is to act, not to speculate or meditate on whether the report is cor- *456 red. People could well die in emergencies if police tried to act with, the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms ‘ exigent circumstances * referred to in Miller v. United States [357 U. S. 301], e.g., smoke coming out a window or under a door, the sound of gunfire in a house, threats from the inside to shoot through the door at police, reasonable grounds to believe an injured or seriously ill person is being held within. ’ ’ (Emphasis added).
Citing the foregoing rule with approval, the Court of Appeals of Maryland in Davis v. State (236 Md. 389, 396 [1964]) held as follows: ‘ ‘ The preservation of human life has been considered paramount to the constitutional demand of a search warrant as a condition precedent to the invasion of the privacy of a dwelling house.”
This principle of law is also clearly set forth by the New York Court of Appeals in People v. Gallmon (19 N Y 2d 389 [1967], cert. den. 390 U. S. 911). In the majority opinion, Judge Bbeitel stated on page 394: ‘ ‘ Perhaps it is of the greatest .significance to this case that the police officer’s entry was pursuant to his general obligation to assist people in distress — a purpose often independent of considerations affecting the criminal law. Police are expected and often required to investigate the unquelled crying of babies, sounds and blows in what turn out to be matrimonial disputes, to assist in child deliveries, and to resolve the causes of unusual sounds suggesting harm to persons, animals, and property.
“ Their functions are just not confined to criminal law enforcement, a matter frequently of great concern to those seeking to make limited police resources more effective. In this context it has been suggested that an officer’s entry is based neither on consent nor license and that even the refusal of consent may be of no avail (cf. Meiers v. Koch Brewery, 299 N. Y. 10, 12, 15; Beedenbender v. Midtown Props., 4 A D 2d 276, 281; 2 Alexander, Law of Arrest, § 634) ”.
In his dissenting opinion in People v. Gallmon (supra, p. 397), Judge Fuld expressed the same rule as follows: ‘1 It is true, as Judge Cabdozo said many years ago, that ‘ Danger invites rescue ’, that the 1 cry of distress is the summons to relief ’. (Wagner v. International Ry. Co., 232 N. Y. 176, 180). It is both realistic and proper to regard policemen, who are duty bound to respond to such a call, as having received the implied consent of the occupant to enter the premises in order to render aid.” (See, also, People v. Roberts, 47 Cal. 2d 374; Davis v. United *457 States, 327 F. 2d 301; United States v. Lodahl, 264 F. Supp. 927.)
When Patrolman McReynolds knocked on the door for the first time and was informed from behind the closed door by the voice of a very young child that neither of his parents, nor anyone else, was inside, he was justified in calling for aid. This justification is based on a possibility that the child might have been speaking the truth and was thus subject to injuries and dangers which might have befallen him when so unsupervised and unattended. In an emergency situation, a police officer need not patiently await definite proof of danger or peril. Where the possibility of danger or peril appears to exist, he may act. Under such circumstances a reasonable possibility of injury to person or property invites the policeman’s investigation.
In People v. Roberts (47 Cal. 2d 374, 379, supra) (which is cited with approval in People v. Gallmon, supra), the Supreme Court of California, in a case involving police response to human moaning, stated this rule in the following language: ‘ ‘ The trial court found that the officers reasonably believed that someone inside the apartment was in distress and in need of assistance and that they entered for the purpose of giving aid. Necessity often justifies "an action which would otherwise constitute a trespass, as where the act is prompted by the motive of preserving life or property and reasonably appears to the actor to be necessary, for that purpose. Ploof v. Putnam, 81 Vt. 471; Metallic Compression Casting Co. v. Fitchburg R. Co., 109 Mass. 277, 280-281; see Restatement, Torts, § 197; Prosser on Torts [2d ed.], 84, 97. The trial judge was fully aware that an entry obtained by trickery, stealth or subterfuge renders a search and seizure invalid. See Gouled v. United States, 255 U. S. 298; Fraternal Order of Eagles v. United States, 57 F. 2d 93. He stated, “ 11 recognize that this opens the way to subterfuge, and I think it rests with the trier of fact to see to it that * * * no subterfuge creeps in, but I don’t think I am justified in making that finding here. * * * I think [the officers] were telling the truth and I so find ’ ”.
A period of about three to four minutes passed between the time when the patrolman knocked on the door for the first time and was informed by the younger child that nobody was home, and when he knocked again the second time and was admitted by the five-year-old girl.
During this period he could reasonably assume that this child was alone, or that a person in charge of the child could be disabled and, therefore, unable to respond to his knock on the door.
*458 An unattended child is prone to all manner of injury. In Garrow v. State of New York (268 App. Div. 534, 537) it was held that: ‘ ‘ More care must he exercised towards children than toward persons of mature age. Children of tender years are entitled to care proportioned to their inability to foresee and avoid the perils that they may encounter. The duty to avoid doing them injury increases with their inability to protect themselves and with their childish indiscretions, instincts and impulses. ’ ’
In Union Pacific Railway Co. v. McDonald (152 U. S. 262, 277) the unpredictable behavior of young children is described in the following language: ‘ ‘ Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate upon this, and take precautions accordingly.” This rule is quoted with approval in Day v. Johnson. (265 App. Div. 383, 387).
The legal consequence of a parent’s leaving a child of tender age under such circumstance is described in Hunter v. Powers (206 Misc. 784, 786) as follows: 1 ‘ Leaving one’s child alone in the home or even on the streets unguarded, unattended and po provision made for its safety or protection Is neglect.”
Under the circumstances confronting Officer McBeynolds, there was indeed more than sufficient justification not only to knock a second time but also to enter and investigate the situation when the five-year-old child later opened the door.
Following the disclosure of the loaded gun and the marijuana by the five-year-old child, the policemen went through the various rooms of the apartment, during the course of which, they saw in open view, the antique scales, the carved bowl containing marijuana, and what appeared to be heroin, and, hanging on the wall, the antique pepper mill gun. They also found other narcotics in drawers, and when the safe was opened, they found two pounds of marijuana, and some ammunition.
Although the five-year-old child was legally incapable of giving the police consent to search the apartment for evidence of crime on behalf of the defendants, it is, however, the determination of this court that the loaded pistol and the plastic bag containing marijuana, which were taken from the cabinet and brought into the view of the police officers by the child, are not the subject of a police search and seizure. These items, comprising a weapon and contraband, insofar as the police were concerned, were in open view, and not the fruits of a search. The marijuana, and what appeared to -be heroin, observed by the police in the carved bowl, were in open view *459 and therefore, not the subject matter of an illegal search and seizure.
It would have been necessary to go into the respective rooms to ascertain if there was anyone else in the apartment or a person in charge of the infants, and, if so, why such person had not responded to the knocking, and whether such person was incapacitated. In so doing, they had the right to seize any item in open view which may be contraband, or the paraphernalia utilized in the use or sale of narcotics, or a weapon.
The foregoing rule of law is based on the humane purposes sought to be effectuated by permitting the policemen to intrude into the privacy of a citizen’s home for the latter’s aid and protection.
However, when the errand of mercy is completed, the benevolent purpose of the intrusion may not be changed into one for a general exploratory search.
In People v. Roberts (47 Cal. 2d 374, 378-379, supra) the Supreme Court of California expressed this rule in the following language: “ The privilege to enter to render aid does not, of course, justify a search of the premises for some other purpose. An arrest may not be used as a pretext to conduct a general search of one’s premises for incriminating evidence, and it has been repeatedly said that where the right to conduct a search is obtained ostensibly for one purpose it may not be used in reality for another. (See Harris v. United States, 331 U. S. 145, 153; Love v. United States, 170 F. 2d 32, 33.) Thus the officers in the present case could properly make only that kind of search reasonably necessary to determine whether a person was actually in distress somewhere in the apartment. They could not, for example, ransack the premises or rummage through desk drawers. On the other hand, in the course of conducting a reasonable search they did not have to blind themselves to what was in plain sight simply because it was disconnected with the purpose for which they entered. Love v. United States, 170 F. 2d 32 [officers entered the defendant’s house lawfully for purpose of searching for another man; in course of search they discovered a distillery in operation]; Paper v. United States, 53 F. 2d 184 [officers entered lawfully for purpose of findng and arresting defendant on one charge; in searching for defendant they discovered an illegal supply of liquor, constituting another offense, in the basement]. The court in the Paper case, said, ‘ Where the entry and search are rightful and there is present no element of trespass or fraudulent invasion of the rights of the citizens, there is no reason for excluding evidence of crime discovered in the course *460 of the search. If the officers * * * had discovered in the cellar a counterfeiting plant in operation, would it have been their duty to ignore it? If they had come upon the body of a murdered man, would their testimony as to finding the body be excluded? ’ ”
After the children had been removed to a safe place for proper care at about 10 p.m., when Lieutenant Looney took them to Meadowbrook Hospital, the only proper alternatives confronting the police officers were either, (1) to leave the apartment with a police guard outside and obtain a search warrant based on the probable cause based on what the child had shown to them and what they had seen in open view during the investigation, or (2) to await the return of the defendants and perform the permitted search of their persons contemporaneously with their arrest. Such search would, of course, be limited to “a search of the arrestee’s person and the area within his immediate control ”, as mandated by the United States Supreme Court in Chimel v. California (395 U. S. 752 [1969]), which construed that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
In this warrantless search, when the officers presumed to look into closed and hidden places in all parts of the apartment, they were not only clearly acting outside the scope of the original purpose of the police entry into the apartment, but also indulging in a general search of the entire house in violation of the defendant’s constitutional rights under the Fourth Amendment, as expressed in Chimel (supra).
Apart from these considerations involving the area of the search, the question also arises that, since this search was concededly without the benefit of a warrant, and under the circumstances would, therefore, only have been the other specie of search, namely, a search made contemporaneously with an arrest, how, if because of the defendants’ absence, their arrest was then Impossible, could this be considered a search made contemporaneously with an arrest?
In Mosco v. United States (301 F. 2d 180, 187 [1962]) the court held that, under such circumstance, where the defendant is absent and therefore cannot be arrested: 1 ‘ No search under these circumstances could be made for the purpose of protecting officers in making an arrest, depriving an arrested person of potential means of escape, or avoiding destruction of evidence by the arrested person. It follows that a search made prior to an arrest and at a time when the officers were physically unable to make an arrest cannot be regarded as ‘ incident ’ *461 to an arrest, within the meaning of the rale.” Moreover, the search must be contemporaneous with the arrest (State v. Doyle, 42 N. J. 334, 343 [1964]; Goss v. State of Alaska, 390 P. 2d 220 [1964]).
More than three hours elapsed from the time when the mission ended and the children were removed to a place of safety at 10 p.m., on November 7th, and when the defendants returned to the apartment at about 1:15 a.m. on November 8th. A search made over three hours before an arrest is not what is contemplated in law to be a search made contemporaneously with an arrest within the meaning of the respective rules herein-above mentioned.
Accordingly, it is the determination of this court that defendant’s motion is denied as to (1) the marijuana and the revolver removed from the cabinet and displayed to the police, (2) the antique scale, the marijuana, and what appeared to be heroin in the carved bowl, which were all in open view.
The motion, however, is granted with respect to the other items of marijuana, and what appeared to be heroin, found as the result of opening drawers, and the contents of the safe which included about two pounds of marijuana and ammunition. When the defendant, Faye Oleare, opened the safe, it was while she was in custody, and under arrest. Such act on her part was not by consent and merely her submission to police authority. ‘ ‘ Submission to authority is not consent and one faced with authority has the right to submit and reserve his defense for the court. (Johnson v. United States, 333 U. S. 10; United States v. Evans, 194 F. Supp. 90)”. (People v. Colletti, 33 Misc 2d 195.)
With respect to the question of standing on the part of the defendant, Tyler Somas, it is the court’s determination that inasmuch as he resided in the apartment, that he was present in the premises, and that he was charged with, and arrested in the apartment for possessory crimes involving cocaine, heroin, marijuana and a weapon, he has standing to contest the People’s right to search and seize such material (Jones v. United States, 362 U. S. 257; People v. Gaines, 36 A D 2d 953 [1971]).
With respect to the Huntley-Miranda (supra) aspect of this hearing, the court finds that shortly after the defendants entered the apartment and identified themselves as the persons who resided there, they were in police custody.
It is also the finding of this court that although the fourfold warnings prescribed by Miranda v. Arizona (supra) were properly stated to the defendants by Detective Stalter, they, *462 however, did not expressly waive their constitutional rights under the Fifth and Sixth Amendments — which is a mandated condition precedent for the admissibility of a defendant’s statement under Miranda (supra). In fact, they remained silent in this regard.
As a consequence, it is the determination of this court that none of the statements made by the defendants in answer to Detective Stalter’s interrogation may be used as evidence upon the trial hereof.
The words, “we do ”, uttered by the defendants when they identified themselves as the occupants of the apartment as they entered, are admissible as being threshold statements made before they were in police custody, and while in the identification process.
With respect to the oral statement made by Tyler Somas to the defendant, Faye Oleare, “ You say every thing in this room is yours, or everything here is yours, and this way I will be free to get you out on bail ’ ’, or words to that effect, they are admissible at the trial hereof, for the reason that such words were not in response to police interrogation, and were merely the spontaneous and volunteered utterances of the defendant, Tyler Somas (People v. McKie, 25 N Y 2d 19; People v. Torres, 21 N Y 2d 49; People v. Lopez, 28 N Y 2d 23).
It is, therefore,
Ordered, that defendant’s motion to suppress certain physical evidence from use upon the trial hereof is denied as to (1) the marijuana and the loaded revolver removed from the cabinet by the child and displayed to the police, (2) as to the antique scale and (3) as to the marijuana and what appeared to be heroin in the carved bowl, all of which shall be admissible on the trial hereof. This motion is hereby granted as to the marijuana, and what appeared to be heroin, and empty glassine bags found in the dresser drawer, and the contents of the safe which included about two pounds of marijuana and ammunition, and it is further
Ordered, that defendant’s Huntley-Miranda motion to suppress defendant’s statements is granted in all respects, except that the words, “we do ”, uttered by the defendants when they identified themselves as occupants of the apartment, and the words uttered by the defendant Tyler Somas to the defendant Faye Oleare, “ You say every thing in this room is yours, or every thing here is yours, and this way I will be free to get you out on bail ”, or words to that effect, shall be admissible upon the trial hereof.