FILED

May 17 2016, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Adam Lenkowsky
Roberts & Bishop
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jennifer Jones and Jamaal Jones, | May 17, 2016 |
| *Appellants-Defendants,* | Court of Appeals Case No. 49A02-1508-CR-1148 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Jose Salinas, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 49G14-1410-F6-48599 & 49G14-1410-F6-48603 |

**Riley, Judge.**

## STATEMENT OF THE CASE[1]

Appellants-Plaintiffs, Jennifer Jones[2] (Jennifer) and Jamaal Jones (Jamaal) (collectively, Jones), appeal the trial court's denial of their motion to suppress the evidence discovered during a warrantless search of their residence.

We affirm.

## ISSUES

Jones raises three issues on appeal, which we restate as:

(1) Whether the warrantless search of Jones' residence is justified based on the exigent circumstances to conduct a welfare check on three minor children left unattended in the home in the middle of the night;

(2) Whether police officers may conduct a protective sweep of the residence as part of a welfare check; and

(3) Whether the Butler University Police Department had jurisdiction pursuant to the Trustees Resolution to conduct a welfare check based on the particular facts in this case.

## FACTS AND PROCEDURAL HISTORY

---

[1] We held oral argument in this case on April 21, 2016 at St. Joseph's College in Rensselaer. We thank the College for its hospitality and counsel for their advocacy.

[2] Jennifer was charged under her maiden name Jennifer DeJesus, but by April of 2015 she had married Jamaal and taken his last name.

[4]     This case comes before us as an interlocutory appeal from the trial court's denial of Jones' motion to suppress. In October of 2014, Jennifer and Jamaal lived with Jennifer's three children, who were six, nine, and twelve, near the Butler University campus in Indianapolis, Indiana.

[5]     On October 20, 2014, around 1:08 a.m., Officer Chris Nelson (Officer Nelson) of the Butler University Police Department (BUPD) initiated a traffic stop[3] of a vehicle driven by Jennifer just south of 42nd Street and Capitol Avenue. Officer Nelson retrieved Jennifer's identifying information and vehicle registration and noticed "an extremely strong odor of marijuana emitting from the vehicle." (Transcript p. 20). Jennifer informed Officer Nelson that "she had just gotten off work and was running to the convenient [sic] store to get milk for her kids for the morning." (Tr. p. 22). After Officer Nelson informed Jennifer of his observation of marijuana odor, Jennifer responded that she "had no idea why it would smell like that and reiterated the fact that she had just gotten off work." (Tr. p. 22). Officer Nelson requested Jennifer to exit and to "step to the rear of the vehicle." (Tr. p. 22). Meanwhile, two other BUPD officers arrived. Officer Nelson conducted a probable cause search of the vehicle and located a marijuana blunt in the ashtray and "several pills that were identified as a controlled substance in a personal bag belonging" to Jennifer. (Tr. p. 23). Officer Nelson placed Jennifer under arrest.

---

[3] Jones does not dispute the propriety of the traffic stop or the subsequent search of the vehicle.

[6] As soon as she was placed under arrest, Jennifer asked, "What about my children? They're home alone[.]" (Tr. p. 24). Officer Nelson informed her that officers would be sent to the house to check on the children and make arrangements for their safety. Officer Nelson transported Jones to the BUPD station. While in route, Officer Nelson requested dispatch to contact the Indianapolis Metropolitan Police Department (IMPD) to conduct a welfare check on the children. At approximately 1:45 a.m., IMPD and Sergeant Anthony Rivera (Sergeant Rivera) of the BUPD arrived at the Jones' residence. The officers were unable to make contact with the children inside the residence.

[7] At the BUPD station, Jennifer was given her cell phone and was asked to call her residence. During the subsequent thirty minutes, Jennifer tried to get in touch with her children but failed. She became concerned and she next contacted her mother-in-law. Officer Nelson decided to go to Jennifer's residence with Jennifer's house keys.

[8] Upon his arrival at the residence, Officer Nelson knocked and announced his presence. At this point, almost an hour had lapsed since Jennifer had informed the officers that her children were home alone. Officer Nelson unlocked the front door, entered the home, and again identified himself and multiple times called to the children. He received no response. As soon as Officer Nelson walked in the residence, he could smell "an extremely strong odor of raw marijuana in the air. It was pretty potent." (Tr. p. 29). Walking toward the bedrooms to search for the children, Officer Nelson noticed a "little bit of [marijuana] remnants on the coffee table." (Tr. p. 29). Moving past that,

Officer Nelson located one of the children sleeping in one of the bedrooms. Another officer was able to locate the other two children in a second bedroom. "Officer Marshall took the third bedroom to the left which ended up being the master suite at which time right in plain view when you walk in the room, he was able to observe a glass jar containing marijuana." (Tr. p. 29). Sergeant Rivera went "down to the basement[,]" where he found lighting systems and marijuana plants. (Tr. p. 55).

[9] After waking the children up, Officer Nelson informed them that their mother would not be returning to the residence that night and that someone needed to be contacted to stay with them. A short while later, the children's grandparents arrived. A search warrant was obtained and executed several hours after the children had been located and removed from the residence. In the course of executing the search warrant, the marijuana and lighting equipment were seized.

[10] On October 22, 2014, the State filed an Information charging Jennifer with dealing in marijuana, a Level 6 felony; possession of a narcotic, a Level 6 felony; neglect of a dependent, a Level 6 felony; possession of a controlled substance, a Class A misdemeanor; and possession of marijuana, a Class B misdemeanor. The State charged Jamaal with dealing in marijuana, a Level 6 felony; possession of a narcotic, a Level 6 felony; neglect of a dependent, a Level 6 felony; and possession of marijuana, a Class B misdemeanor. On November 12, 2014, Jones filed a motion to suppress, which was amended on December 4, 2014. On April 23, 2015, the trial court conducted an evidentiary

hearing on the amended motion to suppress. On July 9, 2015, the trial court issued its ruling from the bench, denying the amended motion to suppress.

On August 17, 2015, the trial court certified its order for an interlocutory appeal, which this court accepted. Additional facts will be provided as necessary.[4]

## DISCUSSION AND DECISION

### I. *Standard of Review*

Jones contends that the trial court erred in denying the motion to suppress the evidence found as a result of a warrantless search. Our standard of review for the denial of a motion to suppress evidence is similar to other sufficiency issues. *Westmoreland v. State*, 965 N.E.2d 163, 165 (Ind. Ct. App. 2012). We determine whether substantial evidence of probative value exists to support the denial of the motion. *Id*. We do not reweigh the evidence, and we consider conflicting evidence that is most favorable to the trial court's ruling. *Id*. However, the review of a denial of a motion to suppress is different from other sufficiency matters in that we must also consider uncontested evidence that is favorable to the defendant. *Id*. We review de novo a ruling on the constitutionality of a search or seizure but we give deference to a trial court's determination of the

---

[4] On February 13, 2016, Jones filed a motion for emergency transfer to the Indiana Supreme Court, which was denied on March 7, 2016.

facts, which will not be overturned unless clearly erroneous. *Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008).

## II. *Exigent Circumstances*

First, Jones contends that the trial court erred when it determined that the BUPD officers had properly entered the residence in the middle of the night to check on the welfare of the minor children based on the exigent circumstances exception of the Fourth Amendment.

The Fourth Amendment protects persons from unreasonable search and seizure, and this protection has been extended to the states through the Fourteenth Amendment. *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001). As such, warrantless searches and seizures inside the home are presumptively unreasonable. *Buckley v. State*, 797 N.E.2d 845, 848 (Ind. Ct. App. 2003). Nonetheless, there are limited exceptions to the warrant requirements under the Fourth Amendment. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. A well-recognized exception is the existence of exigent circumstances. *Id*. Under this exception, police officers may enter a residence if the situation suggests a reasonable belief of risk of bodily harm or death, a person in need of assistance, a need to protect private property, or actual or imminent destruction or removal of evidence before a search warrant may be obtained. *Scott v. State*, 803 N.E.2d 1231, 1235-36 (Ind. Ct. App. 2004). "However, a police officer's subjective belief that exigent circumstances exist is insufficient to support a warrantless search." *United States v. Richardson*, 208

F.3d 626, 629 (7th Cir. 2000), *cert. denied*, 531 U.S. 910 (2000). Rather, "as is normally the case for Fourth Amendment inquiries, the test is objective: 'the government must establish that the circumstances as they appear at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.'" *Id*. (quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993)). In this light, "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009). "[E]xigent circumstances justify dispensing with the search warrant but do not eliminate the need for probable cause." *Harless v. State*, 577 N.E.2d 245, 248 (Ind. Ct. App. 1991). "[I]n an emergency, the probable cause requirement may be satisfied where the officers reasonably believe a person is in danger." *United States v. Holloway*, 290 F.3d 1331, 1338 (11th Cir. 2002), *cert. denied*, 537 U.S. 1161 (2003). The United States Supreme Court has recognized that "customary social usage" will have a "substantial bearing on Fourth Amendment reasonableness in specific circumstances." *Georgia v. Randolph*, 547 U.S. 103, 212, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

[15] Based on a survey of case law of our sister jurisdictions, Jones reached the conclusion that courts have upheld the warrantless entry into residences to assist unattended children of "tender age" or "small children." *See People v. Somas*, 68 Misc.2d 450, 458 (Nassau Co. Ct. 1972) (where the court upheld the entry into a house with unattended children, aged two and five years, and the

older child had informed the officers that there were drugs and guns in the residence); *United States v. Taylor*, 624 F.3d 626 (4th Cir. 2010), *cert. denied*, 563 U.S. 925 (2011) (where the court upheld a search of the house of a four-year-old who was out wandering and whose parents could not be located). At the same time, Jones also refers to two Indiana cases: *State v. Crabb*, 835 N.E.2d 1068 (Ind. Ct. App. 2005), *trans. denied* and *Holder v. State*, 847 N.E.2d 930 (Ind. 2006).

[16]     In both *Crabb* and *Holder*, this court upheld the warrantless entry into a residence based on exigent circumstances. In each case, officers commenced an investigation after detecting a strong chemical odor in the air. *Crabb*, 835 N.E.2d at 1069; *Holder*, 847 N.E.2d at 933. After knocking on the door of the residence from which the odor emanated, the officers were advised that a young child was in the house. *Crabb*, 835 N.E.2d at 1069; *Holder*, 847 N.E.2d at 934. In both *Crabb* and *Holder*, the court concluded that under the circumstances the officers had a reasonable objective belief that a person inside the residence was in need of aid. *Crabb,* 835 N.E.2d at 1070*; Holder,* 847 N.E.2d at 940*.*

[17]     Based on the out-of-state jurisprudence and the two Indiana cases, Jones distills and proposes the following rule: "police may make warrantless entries into homes solely based on concern for the welfare of unattended children only when the children are of such a tender age that they are not capable of caring for themselves; otherwise, the police need some objective, articulable concern for the safety of the children." (Appellants' Br. p. 15). Applying this rule to the facts before us, Jones focuses on the twelve-year-old child who "was of such an

age that she was capable of babysitting and the attendant responsibilities and duties." (Appellants' Br. p. 14). Distinguishing the children from "small children" or "children of a tender age," Jones assures that they were capable of functioning on their own for periods of time. (Appellants' Br. p. 16). Therefore, as there was no objective danger to the safety of the children which could support the exigent circumstances exception of the Fourth Amendment, Jones contends that BUPD's entry into the residence violated Jones' Fourth Amendment rights.

[18] Relying on *Fisher*'s pronouncement that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception," the State focuses on out-of-state and federal caselaw identifying circumstances in which officers may enter a home to provide aid to unattended children. *Fisher*, 558 U.S. at 49. The State posits that the children were too young to be left alone for any significant amount of time. "[T]he uncertainty of the situation combined with the vulnerability of [Jennifer's] young children presented a need for the officers' immediate action." (Appellee's Br. p. 18).

[19] In support of its argument, the State points to *U.S. v. Bradley*, 321 F.3d 1212, 1213 (9th Cir. 2003), where officers had arrested Williams, Bradley's passenger, during a traffic stop. Based on previous encounters, the officers knew Williams had a nine-year-old son, whom Williams admitted was at her house. *Id.* at 1214. When they did not receive a response after knocking on the residence's front door, the officers entered the house to search for the child. *Id*. The court held that based on the particular facts . . . [t]he possibility of a nine-year-old

child in a house in the middle of the night without supervision of any responsible adult is a situation requiring immediate police assistance." *Id*. at 1215. *See also State v. Peterson*, 543 S.E.2d 692, 696 (Ga. 2001) (where the court noted that an officer's entry in the house for the purpose of seeing that the children who had been left without responsible adult supervision were cared for properly was not a violation of the residents' Fourth Amendment rights), *cert. denied* 534 U.S. 955 (2001).

[20]   Upon review, we find *Crabb* and *Holder* inapposite to the facts at hand. In both cases, the officers were investigating a chemical odor in the neighborhood and were not called solely for a welfare check. While a young child ultimately became the reason for the officers to enter the residence without a warrant, this minor was not the officers' primary concern when knocking on the residence's door. Rather, just like *Bradley*, the officers arrived at Jones' residence in the middle of the night to check on the welfare of three unattended minor children after having conducted a traffic stop which resulted in their mother's arrest. Despite their mother's phone calls and the officers' knocking on the front door, the children did not respond. When the officers were unable to wake the children, they "reasonably could have interpreted the silence that met their knocks as an inability to respond." *Montgomery v. State*, 940 N.E.2d 374, 380 (Ind. Ct. App. 2009), *trans. denied*. We find that the reasonable belief that minor children in a residence are without adult supervision is an exigent circumstance that authorized police entry to help those believed to be in need of immediate aid. Unlike the majority of cases discussing exigent circumstances, the officers

here were not motivated by an intent to apprehend a suspect or to seize incriminating evidence. *See, e.g., Mc Dermott v. State*, 877 N.E.2d 467 (Ind. Ct. App. 2007), *trans. denied*.

[21] In cases like the one before us which involve older children, Jones would have us require the officers to obtain specific corroborating evidence of a serious, life-threatening injury before entering the residence. However, "the very point of exigent circumstances is that officers are confronted with a situation where time is of the essence and immediate action required." *Montgomery*, 904 N.E.2d at 381. We cannot find many situations more urgent than three children left alone in their home in the middle of the night without any certainty as to when a responsible adult might next enter the house. Indeed, more than once, at the time of her arrest and subsequently, Jennifer expressed concern for the welfare of her children who were home alone. The lateness of the hour and lack of knowledge as to the conditions inside the home increased the exigency of the situation. As stated by the Supreme Court, "[w]e do not question the right of the police to respond to emergency situations . . . The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal." *Mincey v. Arizona*, 437 U.S. 385, 392-93, 98 S.Ct. 2408, 57 L.Ed. 290 (1978). We conclude that the State established both exigency and an objectively reasonable belief that the children were in need of aid. Therefore, the officers' warrantless entry of Jones' residence did not violate the Fourth Amendment. *See Campos*, 885 N.E.2d at 596.

### III. *Protective Sweep*

[22]     Next, Jones contends that the evidence from Sergeant Rivera's protective sweep of the basement should be suppressed as the "protective sweep incident to a welfare check" took place "after the children had been located and secured." (Appellants' Br. p. 17). Even though Sergeant Rivera articulated that he had been given some information that a male might be in the house, Jones maintains that the protective sweep occurred after the children had been located and the exigency had ceased.

[23]     In *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court held that incident to an arrest, police officers may, as a precautionary measure and without probable cause or reasonable suspicion, conduct a brief search of areas immediately adjoining the place of arrest from which an attack could be immediately launched. The Court emphasized that "such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335.

[24]     While we acknowledge the conflicting evidence in the record as to whether the basement was entered before or after the children were located, the trial court found:

> But I believe the search of the basement for a protective sweep that was done in conjunction with the welfare check was appropriate. They hadn't found the kids yet. Some of the officers were checking the bedrooms. One officer was checking the basement.

(Tr. p. 115). Accordingly, mindful of our deference to the trial court's determination of facts, we cannot categorize Sergeant Rivera's entry into the basement as a protective sweep because the Sergeant's primary purpose in entering the basement was not to deter possible attacks and to establish a safety perimeter, but to locate the children. Therefore, as the exigency was still in existence, we conclude that Sergeant Rivera's entry into the basement was permissible.

## IV. *BUPD Jurisdiction*

[25] Lastly, Jones claims that BUPD exceeded its jurisdiction when it conducted the welfare check on the minor children. Indiana Code section 21-17-5-5(b) authorizes university police officers to exercise general jurisdiction over their own buildings and adjacent streets. Beyond this, their jurisdiction may be extended by Board resolution. I.C. § 21-17-5-5(c)(1). Here, Butler University generally extended BUPD jurisdiction to the entire state of Indiana and then placed certain restrictions on its application. Most notably, BUPD can exercise this extended jurisdiction within Marion County only when, among others, the officer "observes a situation where there is danger to personal or public safety arising out of criminal or non-criminal circumstances and immediate action would help alleviate the danger" or the officer "provides aid to members of the community during an emergency." (Def. Ex. A, p. 2). The trial court determined that both restrictions applied to the situation at hand.

[26] Because we concluded that the officers' entry into Jones' residence was justified as an emergency situation to render aid to three unattended minors in the middle of the night, BUPD's action fell squarely within their extended jurisdiction of providing aid to members of the community.

[27] Moreover, even without Butler's Trustees Resolution, which extended BUPD's jurisdiction outside its campus in certain instances, we would still uphold the trial court's denial of Jones' motion to suppress. In *Morris v. State*, 43 N.E.3d 692, 694 (Ind. Ct. App. 2015), where a Marian University police officer effectuated a vehicle stop outside his jurisdiction, we concluded that:

> Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment. . . . [S]uppression is appropriate only where police acts are sufficiently culpable and suppression can meaningfully deter those acts. The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances.

*Id*. at 696 (ellipses in original) (quoting *Shotts v. State*, 925 N.E.2d 719, 724 (Ind. 2010). *See also Zavala v. State*, 739 N.E.2d 135, 140 (Ind. Ct. App. 2000) ("Generally, unless a statute expressly provides otherwise, the exclusionary rule is not available as a remedy for a violation of the statute."), *trans. denied*. The evidence before us establishes that the BUPD officers' actions were not instigated based on a search for criminal evidence but rather, they acted out of a

good faith belief that they were rendering aid to members of the community by checking on the children.

## CONCLUSION

[28] Based on the foregoing, we conclude that (1) the warrantless search of Jones' residence is justified based on the exigent circumstances to conduct a welfare check on three minor children left unattended in the home in the middle of the night; (2) the officers permissibly entered the basement because the children were not yet located; and (3) BUPD's action fell within the extended jurisdiction provide by the Trustees Resolution. Therefore, we affirm the trial court's denial of Jones' motion to suppress.

[29] Affirmed.

[30] Najam, J. and Robb, J. concur