ATTORNEY FOR APPELLANT
Frank R. Hahn
Law Office of John Burley Scales
Boonville, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 87S05-0505-CR-194

SCOTT S. HOLDER,                                    *Appellant (Defendant below),*

v.

STATE OF INDIANA,                                   *Appellee (Plaintiff below).*

Interlocutory Appeal from the Warrick Circuit Court, No. 87C01-0301-FB-6
The Honorable David O. Kelley, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 87A05-0402-CR-94

**May 18, 2006**

Dickson, Justice.


In this interlocutory appeal, the defendant, Scott S. Holder, challenges the trial court's denial of his motion to suppress evidence of a methamphetamine laboratory, finished methamphetamine product, and reagents and precursors of the drug found in his home and on his person on January 14, 2003. He was charged with four counts related to the manufacture and possession of the drug and paraphernalia, one count of maintaining a common nuisance, and one count of neglect of a dependent. The Court of Appeals reversed. Holder v. State, 824 N.E.2d 364 (Ind. Ct. App. 2005). We granted transfer, Holder v. State, 831 N.E.2d 745 (Ind. 2005), and we now affirm the trial court's denial of the defendant's motion to suppress.

The defendant asserts that the evidence should be suppressed because it violated the unreasonable search and seizure provisions in Article 1, § 11, of the Indiana Constitution, and the Fourth Amendment to the Constitution of the United States. The defendant challenges two specific acts by the police. First, the defendant seeks suppression of the evidence discovered after police came upon his residential property without a warrant and sniffed at his basement window to find the source of an odor of ether they had detected in the neighborhood.[1] Second, the defendant argues that evidence must be suppressed where, subsequent to the sniff and in spite of the defendant's refusal of consent to entry into his home, the police entered without a warrant and in the absence of exigent circumstances or other justification.

The defendant's arrest resulted from the work of officers from the Boonville, Indiana, Police Department on January 14, 2003. At the suppression hearing, Officer Jonathan Bruner testified that he was patrolling the city in his squad car when he detected the strong odor of ether in the air. For about fifteen minutes, he drove up and down the streets of the nearby two- or three-block area in an effort to find the source of the odor and then returned to the point where he first detected the scent. Believing that he had discovered the possible area from which the odor was being radiated, Officer Bruner called Lieutenant Mark Hadley, who arrived on the scene shortly thereafter accompanied by Boonville Police Chief Joe Harmon. The additional two officers also believed that they smelled ether in the air, and they joined Officer Bruner in a walk through the neighborhood. They began walking behind two residences on the defendant's street and determined after a brief period that the odor appeared to be near the defendant's house. The point where Officer Bruner first smelled ether was approximately one hundred yards and downwind from the defendant's house.

Officer Bruner could smell a strong odor of the chemical as he approached the house, and he and the other officers also spotted a pickup truck behind it parked on a concrete slab with the hood up. Officer Bruner explained that the truck was parked behind the defendant's house and to

---

[1] Ether is a chemical commonly known among law enforcement to be employed in the manufacture of methamphetamine. The Indiana General Assembly has made it a Class D felony to possess ether along with another listed precursor or chemical reagent with intent to manufacture methamphetamine. *See* Ind. Code §§ 35-48-4-14.5(a), (e).

the east and that he believed a driveway ran from the slab along the south side of the house to the street.[2] The officers suspected that open containers of starting fluid, a product consisting largely of ether, could be near the truck, but upon inspection, they found none. Ruling out the truck, but still noticing the strong odor as the officers approached the defendant's home, Officer Bruner checked around the defendant's property, eventually sniffing near a cracked basement window on the side of the house, where he detected a very strong odor of ether emanating from it.

Chief Harmon then knocked on the front door, but there was no answer. He went to the back door and knocked, and the defendant peeked through the window, waited about ten seconds, and opened the door, resulting in a rush of ether fumes outside. He stepped outside and closed the door behind him. The officers informed the defendant that they had detected a strong odor of ether coming from his house. The defendant denied smelling anything but volunteered that he had been charged with manufacturing methamphetamine in an adjacent county. The officers requested the defendant's consent to search the house, but the defendant refused and told them to get a warrant. Lieutenant Hadley then placed a call to get a warrant started, and the other officers continued further discussion with the defendant. In response to the officers' advice that the defendant stay outside with them while they waited for the warrant, the defendant informed them that his infant granddaughter and two adults were in the house, whereupon the police entered the home without the warrant. Based upon the officers' initial observations, a warrant was eventually obtained by the Warrick County Police Department, and their resulting search disclosed a methamphetamine lab, precursors, finished methamphetamine, and drug paraphernalia.

---

[2] Officer Bruner testified during the suppression hearing with the aid of a diagram. Portions of his testimony caused it to appear that he was pointing to the diagram as he spoke, and his use of the visual aid caused some relevant parts of his description of the area surrounding the defendant's home to be excluded from the transcript. The diagram used in the hearing was not included in the record, but it may be gathered from the officer's testimony that the defendant's house was situated so that the front, street-side of the house faced west. And the officer's description of the pickup truck parked "to the east" on a concrete slab that he believed to be connected to a drive along the house at "the south part all the way back" suggests that a driveway ran from the street along the south side of the house to the concrete slab in the back near the southeast corner of the house. Tr. at 12. Officer Bruner then testified that the cracked basement window was "on the south side of the house . . . on the west side." *Id*. at 13. This testimony and his report's description of the window "on the southwest corner of the home" places the window on the south side of the house, facing the driveway, and toward the front of the house. Appellant's App'x. at 89.

We review the trial court's denial of the defendant's motion to suppress based upon a standard similar to that employed for other sufficiency of evidence considerations. The Court will consider the evidence favorable to the trial court's ruling, as well as substantial uncontradicted evidence to the contrary, to decide whether the evidence is sufficient to support the ruling. Murphy v. State, 747 N.E.2d 557, 559 (Ind. 2001); Ogle v. State, 698 N.E.2d 1146, 1148-49 (Ind. 1998).

The federal Fourth Amendment and Article 1, Section 11, of the Indiana Constitution protect citizens from unreasonable searches and seizures.[3] In spite of the similarity in structure of the federal and state constitutional provisions, interpretations and applications vary between them. State v. Bulington, 802 N.E.2d 435, 438 (Ind. 2004); State v. Gerschoffer, 763 N.E.2d 960, 963 (Ind. 2002); Baldwin v. Reagan, 715 N.E.2d 332, 337 (Ind. 1999); Brown v. State, 653 N.E.2d 77, 78, 79 (Ind. 1995). "The Indiana Constitution has unique vitality, even where its words parallel federal language." Gerschoffer, 763 N.E.2d at 965 (citing Ajabu v. State, 693 N.E.2d 921, 929 (Ind. 1998)). When we interpret language in our state constitution substantially identical to its federal counterpart, "we may part company with the interpretation of the Supreme Court of the United States or any other court based on the text, history, and decisional law elaborating the Indiana constitutional right." Ajabu, 693 N.E.2d at 929. Based on this principle and that the defendant has alleged both federal and state constitutional violations and supported the allegations with separate analyses, we engage in independent examinations of the defendant's claims based upon Section 11 and the Fourth Amendment.

**Fourth Amendment**

The defendant first contends that when the police went to his basement window to sniff for ether, they invaded the curtilage of his home without a warrant, thereby conducting a search prohibited by the Fourth Amendment. Without such an invasion, the defendant maintains, the

---

[3] The Fourth Amendment to the United States Constitution proclaims, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . . ." U.S. CONST. amend. IV. Section 11 in the Indiana Bill of Rights states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." IND. CONST. art. 1, § 11.

4

police would not have been able to pinpoint his home as the source of the smell of ether wafting in the air of his neighborhood.

Searches performed by government officials without warrants are per se unreasonable under the Fourth Amendment, subject to a "few specifically established and well-delineated exceptions." Katz v. U.S., 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). A search without a warrant requires the State to prove an exception to the warrant requirement applicable at the time of the search. White v. State, 772 N.E.2d 408, 411 (Ind. 2002).

To trigger Fourth Amendment protections, a search arises out of an intrusion by a government actor upon an area in which a person maintains a "reasonable expectation of privacy." Katz, 389 U.S. at 360, 88 S.Ct. at 516, 19 L.Ed.2d at 587 (Harlan, J., concurring). Therefore, whether Fourth Amendment protections should be applied embraces a two-part inquiry: (1) whether a person has "exhibited an actual (subjective) expectation of privacy;" and (2) whether "the expectation [is] one that society is prepared to recognize as 'reasonable.'" *Id*. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588. "Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited." *Id*.

The land immediately surrounding and associated with a home, the curtilage, also merits the Fourth Amendment protections that attach to the home. Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214, 225 (1984). The curtilage is defined on a case-by-case basis by reference to factors that determine whether a person's expectation of privacy in the area adjacent to the home is reasonable and analysis whether the area embraces the intimacy associated with the sanctity of the home and privacies of life. *Id*.; United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, 334 (1987). Thus defining the curtilage requires more than an identification of the physical area immediately adjacent to the home; whether the area is enclosed, how it is being used, and the steps taken to keep it out of view are also analyzed to determine whether a person has a reasonable expectation of privacy in the area, demonstrating that it embraces the characteristics similar to those associated with the sanctity of the home. *See* Dunn, 480 U.S. at 301, 107 S.Ct. at 1139, 94 L.Ed.2d at 334-35; California v.

5

Ciraolo, 476 U.S. 207, 212-13, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210, 216 (1986). This required approach for defining the curtilage is consistent with the principle that "the Fourth Amendment protects people, not places." Katz, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582.

It is unclear from the record whether the officers encroached the curtilage to the defendant's home to sniff at the basement window. Officer Bruner detected the smell of ether from as far away as one hundred yards. That the smell was escaping through an opening in a basement window and was identifiable from far away suggests that the defendant did not take appreciable steps to keep the activities around the window private. On the other hand, although the ether smell emanating from the cracked window suggested the nature of activity conducted inside, it did not reveal anything about how the area just outside the window, which was the area actually invaded by the officer to perform the sniff, was being used by the defendant. Also unclear is whether the defendant had made any attempt to keep the area private by installing an artificial boundary, such as a hedge, fence, or other landscaping work, near the window. And we cannot comprehend from the record whether Officer Bruner had to step off of the driveway and onto some other terrain in order to stoop near the window.

But regardless of the condition of the area around the window and whether it was demonstrative of an effort by the defendant to keep it private, and regardless whether Officer Bruner had to step off of the driveway in order to sniff at the window, a warrantless intrusion upon a curtilage may be permissible under the Fourth Amendment if it fits within one of the established exceptions. *See* Katz, 389 U.S. at 357, 88 S.Ct. at 514, 19 L.Ed.2d at 585. One exception allows police to dispense with the warrant requirement in the presence of exigent circumstances. The warrant requirement becomes inapplicable where the "'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290, 301 (1978). Among the exigencies that may properly excuse the warrant requirement are threats to the lives and safety of officers and others and the imminent destruction of evidence. *See* Minnesota v. Olson, 495 U.S. 91, 100, 110 S.Ct. 1684, 1690, 109 L.Ed.2d 85, 95 (1990). Law enforcement may be excused from the warrant requirement because of exigent circumstances based on concern for safety as long as the State can prove that a delay to wait for a

warrant would gravely endanger the lives of police officers and others. <u>Warden v. Hayden</u>, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782, 787 (1967); *see also* <u>Geimer v. State</u>, 591 N.E.2d 1016, 1019 (Ind. 1992).

The Court of Appeals recently decided <u>State v. Crabb</u>, 835 N.E.2d 1068 (Ind. Ct. App. 2005), where it determined that a complaint from neighbors about a chemical odor, police officer detection of the same odor and identification of it as ether, an indication that people were inside, and credible evidence that among those people was a small child, combined to form exigent circumstances permitting the warrantless entry into the defendant's house. *Id*. at 1070. This determination was based on the officers' knowledge that ether is used in the manufacture of methamphetamine and that it is flammable and explosive and can have damaging effects on people, such as numbing of the senses and a loss of consciousness. *Id*. at 1071.

We agree with the Court of Appeals analysis in <u>Crabb</u>. Akin to the circumstances for the police in <u>Crabb</u>, the exigencies of the situation before Officer Bruner and the other policemen in this case created the need to find the source of the ether odor, which led them to walk across the private property of several residents in the neighborhood and ultimately crouch near the defendant's basement window to take a sniff. Before sniffing at the window, the evidence shows that Officer Bruner possessed knowledge of the following: from about one hundred yards, he sensed the smell of ether, Tr. at 6; more than fifteen minutes later, the two other officers confirmed the odor still in the air, Tr. at 10-11; from where the officers parked, the smell appeared to be coming from the direction of the defendant's house, Appellant's App'x. at 89; the smell did not originate from a parked truck nearby, Tr. at 11-12; ether is flammable and explosive, and, in fact, it is designed to be flammable for at least one of its intended purposes, Tr. at 36-37; and the amount of ether required to fill the air enough to be detected from such a great distance and over such a long period of time is much greater than is used for the chemical's intended purpose, Tr. at 36-40.

The significant degree of the fumes from a known explosive and flammable chemical in a residential area compelled the officers to find its source for the sake of the safety and health of the nearby residents. Thus exigent circumstances existed allowing the officers to search the area

for that purpose. The scope of this search was required to "be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889, 904 (1968) (quoting Hayden, 387 U.S. at 310, 87 S.Ct. at 1652, 18 L.Ed.2d at 794 (Fortas, J., concurring)). The officers walked across residential lawns and around the defendant's property before stooping outside the window, which describes conduct strictly geared toward the discovery of the source of the ether smell and, therefore, within the permissible scope of the warrantless search.

The defendant attempts to support his assertion that the Fourth Amendment invalidates the sniff at his window by relying almost exclusively on the Court of Appeals decision in Divello v. State, 782 N.E.2d 433 (Ind. Ct. App. 2003), *trans. denied*. Divello also involved the detection of drug activity by smell and the trespass onto the defendant's curtilage by police, but the cases are otherwise distinguishable. *See id*. at 439. In Divello, the police went to the defendant's house to follow up on an anonymous tip that marijuana was being grown there. *Id*. at 437. Upon receiving no answer to their knock at the front door, the police walked to a place in between the defendant's house and driveway and sensed the smell of marijuana escaping. *Id*. at 439. There was no evidence that exigent circumstances compelled the police to trespass this portion of the defendant's property. And the court concluded that the police did not detect the smell from a place they had a lawful reason to be. *Id*. at 437.

Officer Bruner, on the other hand, did have a legitimate reason under the Fourth Amendment to be near the defendant's basement window, for his presence there was within the permissible scope of a search of the defendant's property outside his house compelled by exigent circumstances that required discovery of the source of dangerous fumes wafting about the neighborhood. As a result, sufficient evidence supported the trial court's conclusion that evidence should not be suppressed on account of the police sniff outside the defendant's basement window. Such conduct was not unreasonable under the Fourth Amendment.

The defendant next argues that exigent circumstances did not justify the warrantless entry of his house after he spoke with the police outside his back door. According to the defendant, there was no indication that evidence could be destroyed or that the police were motivated by a

8

concern for occupant safety sufficient to constitute exigent circumstances.

Possible imminent destruction of evidence is one exigent circumstance that may justify a warrantless entry into a home if the fear on the part of the police that the evidence was immediately about to be destroyed is objectively reasonable. Esquerdo v. State, 640 N.E.2d 1023, 1027 (Ind. 1994). Courts will demand a genuine showing of emergency before excusing the failure to obtain a warrant, and the State must show that law enforcement was faced with circumstances making it impracticable to wait for a search warrant by clear and convincing evidence. Hawkins v. State, 626 N.E.2d 436, 439-40 (Ind. 1993). Essentially, the officers must have a reasonable belief that people within the premises are presently destroying or directly about to destroy evidence, the nature of which must have an evanescent quality. Esquerdo, 640 N.E.2d at 1027 (quoting Harless v. State, 577 N.E.2d 245, 248 (Ind. Ct. App. 1991)).

We agree with the defendant that the circumstances facing the police outside the defendant's back door do not demonstrate clearly and convincingly a reasonable belief that people inside the home were destroying or were about to destroy evidence. No evidence was offered by the State suggesting a current or imminent effort to discard evidence inside the home. For example, the police did not testify that they heard scurrying or a rush of activity in the house evidencing an attempt to take down the operation. The record also does not suggest that a methamphetamine laboratory could be disassembled or concealed in the time it took police, who had the home under surveillance, to obtain a search warrant. While finished product and powders and liquids used in the manufacture might be disposed of down a drain, other components necessary for the manufacture of methamphetamine would nearly be impossible to remove from the premises, or even to conceal within the premises, under the circumstances.

The warrantless police entry in this case, however, was motivated by two reasons. Although their primary concern appears to have been the possible imminent destruction of evidence, the police were also focused upon the risk of immediate danger to a young child in the volatile atmosphere of the home. The officers entered the home before arrival of the warrant only after they learned of the occupants, including a young child, inside the home. Officer Bruner described the decision to enter the home:

9

> [The defendant] stated that he had a granddaughter inside that he needed to take care of. We asked the age of the granddaughter. I believe he said three-and-a-half years old. And I then asked him if anyone else was in the residence and he stated he had two friends inside. I asked if they was over the age of twenty just being somebody that would be able to destroy evidence. He stated yes and myself and Chief Harmon decided that *with the three-and-a-half-year-old inside*, two others inside, they could possibly be destroying evidence at that time, that we would go in the house.

Tr. at 18 (emphasis added). The expressed concern about the presence of the young child was in addition and unrelated to the possible destruction of evidence. By the time the police officers decided to enter the house, they had lawfully obtained the following knowledge: the odor of ether was escaping from the basement of the house through a cracked window; the defendant did not respond to the first knock at the door by the police, and he delayed opening the door on the second knock for several seconds after he identified who was at the door through the window; the strong smell from inside the home was also detected in the short time during which the defendant had his door open; the defendant admitted to pending charges in another county for the manufacture of methamphetamine; and the production of methamphetamine introduces a high risk of explosion and fire. And then police learned that a three-year-old girl remained inside the house. Because the officers' reasons for the warrantless entry included their concern for substantial risk of immediate danger to an occupant from the highly flammable and explosive atmosphere in the home, their warrantless entry was justified by exigent circumstances.

Several courts have concluded that a belief that an occupied residence contains a methamphetamine laboratory, which belief is found on probable cause based largely on observation of odors emanating from the home, presents exigent circumstances permitting a warrantless search for the occupants' safety. *See, e.g.*, Kleinholz v. United States, 339 F.3d 674, 676-77 (8th Cir. 2003) (concluding that the "volatile nature of [methamphetamine] labs . . . justified an immediate but limited search" by exigent circumstances because the police had probable cause to believe the home contained a lab); United States v. Rhiger, 315 F.3d 1283, 1289-90 (10th Cir. 2003) (concluding that the strong odor of methamphetamine production springing from a residence and an agent's knowledge about the "inherent dangerousness of an active methamphetamine lab" contributed to reasonable grounds for agents immediately to enter the home in order to protect the public); United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002) ("The potential hazards of methamphetamine manufacture are well documented, and numerous cases have upheld limited warrantless searches by police officers who had probable cause to believe they had

10

uncovered an on-going methamphetamine manufacturing operation."); United States v. Wilson, 865 F.2d 215, 217 (9th Cir. 1989) ("[F]aced with a potential disaster in the form of an ether explosion and fire . . . exigent circumstances existed because . . . a reasonable person could have believed that immediate entry was necessary to safeguard public safety . . . ."). We agree.

We hold that an objectively reasonable belief in the immediate need to protect the public from death or serious injury supported the officers' conclusion that exigent circumstances justified the immediate warrantless entry into the defendant's house, notwithstanding the unreasonable search and seizure provisions of the Fourth Amendment.

**Article 1, Section 11**

Separate from his federal constitutional claim, the defendant asserts that the officers' warrantless sniff at the basement window and entry into his home violated Art. 1, § 11, of the Indiana Constitution.

Our analysis of claims under Section 11 does not demand that we look to the same requirements as those examined under the United States Constitution; rather, our investigation under Section 11 places the burden on the State to demonstrate that each relevant intrusion was reasonable in light of the totality of the circumstances. Bulington, 802 N.E.2d at 438; Gerschoffer, 763 N.E.2d at 965; Baldwin, 715 N.E.2d at 337; Brown, 653 N.E.2d at 79-80. As we consider reasonableness based upon the particular facts of each case, the Court also gives Art. 1, § 11, a liberal construction to angle in favor of protection for individuals from unreasonable intrusions on privacy. Gerschoffer, 763 N.E.2d at 965. At the same time, "Indiana citizens have been concerned not only with personal privacy but also with safety, security, and protection from crime." Id. at 966 (quoting Mitchell v. State, 745 N.E.2d 775, 786 (Ind. 2001)). It is because of concerns among citizens about safety, security, and protection that some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward those concerns. Thus, we have observed "that the totality of the circumstances requires consideration of both the degree of intrusion into the subject's ordinary activities and the basis upon which the officer selected the subject of the search or seizure." Litchfield v. State, 824 N.E.2d 356, 360 (Ind. 2005). Our determination of

the reasonableness of a search or seizure under Section 11 often "turn[s] on a balance of:  1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.* at 361.

We note first that the officers detected the odor of ether from elsewhere in the neighborhood, far from the defendant's home.  The officers identified the smell as being ether, with a strong intensity.  They knew ether was dangerous because of the explosive and flammable nature of the chemical.  The officers were able eventually to narrow the source of the smell to a smaller area near the defendant's home, where they observed a truck with the hood up.  An investigation of the area around the truck narrowed their search for the source even more, for there were no containers of starting fluid near it.  Knowing that the smell of ether was likely unassociated with any work being done on the truck, the officers necessarily continued to check around the area from which they had estimated the smell to have originated.  Their discovery of ether fumes escaping from the defendant's basement window supported a decision to knock at the front and back doors to satisfy the need for the police to acquaint themselves with the occupants and the activities in which they were engaged.  The defendant's release of more ether fumes into the outdoor air when he opened his door and his revelation to the officers that he had methamphetamine charges pending in another county, along with his disclosure that others, including a child, were present in the house, together clearly demonstrate two of the three Litchfield balancing factors— police concern that a violation of law has occurred, and the extent of law enforcement needs for protection of the public.

These two considerations strongly outweigh the nature and extent of the intrusions imposed on the defendant, whether by the police entry into the defendant's yard and their sniff at the defendant's cracked basement window, or by their approach and knock upon his back door, or by their eventual entry into the home.  This is not a case of an individual police officer momentarily detecting a faint scent of ether.  Here the odor was so strong and persistent that it had pervaded the neighborhood.  Investigating and exploring to find the source of the odor from a volatile substance, the officers ultimately found that it emanated from the defendant's home from two sources:  the basement window and the rear door when opened by the defendant.  This was

12

clear and substantial evidence of the presence of ether in the house.

The defendant argues, based upon <u>Shultz v. State</u>, 742 N.E.2d 961 (Ind. Ct. App. 2001), *trans. denied*, that the knock at the back door imposed a high degree of intrusion. In <u>Shultz</u>, officers, while investigating a case of a stolen semi-tractor, believed they had found the missing vehicle on the defendant's property and knocked at the door. Upon receiving no answer, the police proceeded to tour the property and observed what they believed to be evidence of other stolen vehicle parts. The Court of Appeals held that the additional search of the property was unreasonable after the police had determined that nobody was home. *Id*. at 966. However, the facts of that case reveal no analogy to the existence of fumes from a chemical highly dangerous to public safety and commonly associated with the production of an illegal drug. A second attempt to see whether anyone occupies a home from which trickles dangerous chemical fumes does not impose a high degree of intrusion on the ordinary lives of citizens within the home. If instead of ether, the smell detected by police were that of escaping natural gas, it would clearly have been reasonable, proper, and expected for the officers to knock at the rear door of a home after the failure of their attempt to rouse occupants at the front door.

We conclude that evidence supports the trial court's denial of the defendant's motion to suppress based upon his claimed violation of Art. 1, § 11.

Having previously granted transfer, we affirm the trial court's denial of the defendant's motion to suppress evidence of the methamphetamine manufacturing operation conducted in his home. The police conduct did not violate the illegal search and seizure provisions contained in either the Fourth Amendment to the United States Constitution or Art. 1, § 11, of the Indiana Constitution.

Shepard, C.J., and Sullivan, Boehm, and Rucker, JJ., concur.

13