

FILED

Oct 31 2016, 5:58 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Susan D. Rayl
Indianapolis, Indiana

Michael Ray Smith
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lance E. Brown,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | October 31, 2016<br><br>Court of Appeals Case No.<br>89A01-1601-CR-128<br><br>Appeal from the Wayne Superior Court<br><br>The Honorable Charles K. Todd, Jr., Judge<br><br>Trial Court Cause No.<br>89D01-1412-F5-104 |

**Mathias, Judge.**

[1] Lance E. Brown ("Brown") was convicted in Wayne Superior Court of battering a public safety officer, a Level 6 felony, by resisting the entry into his Richmond home by two officers ("the Officers") of the Richmond Police Department ("RPD"). Brown appeals his conviction as unsupported by evidence sufficient to rebut his affirmative defenses of self-defense and defense

of his dwelling, and challenges the trial court's interpretation of applicable statutes.

[2] We affirm.[1]

## Facts and Procedural Posture

[3] On December 23, 2014, Brown owned a home in Richmond, Indiana, which he was in the process of renovating. Brown kept a large stock of valuable material used in the renovation stored in his house and in a freestanding garage at the edge of his back yard. The neighborhood had a good deal of crime and poverty. Brown, having repelled several break-in attempts in the past, including one on the day in question, was wary of trespassers.

[4] Across a narrow alley from Brown's back yard, Savannah Moore ("Moore") and Matt Smith ("Smith") were renting a home together, the back yard of which faced Brown's. They had recently moved in and not yet met Brown. On December 23, 2014, between 5:00 p.m. and 9:00 p.m., Moore was alone in her back yard, cleaning up trash scattered by her dogs. Moore noticed that Brown was observing her from his property across the alley. "Do you need something?" asked Moore. "Do you need something?" countered Brown. "No," said Moore, and continued her work. Tr. p. 13.

---

[1] We heard argument in this case on October 3, 2016, at Hamilton Southeastern High School in Fishers, Indiana. We thank our hosts, particularly Ms. Janet Chandler, for our warm welcome, and the students and faculty of Hamilton Southeastern for their attentiveness and interest.

Hearing voices outside, Smith came out of the house and joined Moore, his girlfriend at the time, in the clean-up effort. Smith grew irritated at Brown's surveillance. "What's your problem, man?" Smith asked Brown. *Id.* at 14. A heated argument followed. Brown, unaware of Smith and Moore's recent occupancy, accused the pair of trespassing to their property and his, which they denied.

"Come across the alley," said Brown. "You want me to come across the alley?" asked Smith. "Yeah," replied Brown, "I do. I've got something for you. I'll blow your brains out." *Id.* at 17. Alarmed, Moore told Brown she would call the police. "Go ahead," Brown laughed. *Id.* at 32. Having reported several break-ins to the RPD without satisfying results, Brown had little expectation the department would respond.

During this confrontation, each side stayed on their respective properties. Brown never advanced toward Moore or Smith, or made any physically threatening gesture. However, Brown kept at least one hand in his pants pocket throughout. From this fact and from Brown's threat, Moore suspected, but never observed, that Brown was concealing a gun as he spoke with her. As promised, Moore went inside with Smith and called the police.

Sometime after sunset, RPD Officer David Spradling ("Spradling") responded to Moore's report, first interviewing Moore and Smith at their home. Spradling heard from Moore that she had been threatened, that she was upset by Brown's words, conduct, and demeanor, and that she suspected he had been armed

during their confrontation. Spradling left Moore's residence intending to hear Brown's account and achieve a peaceful resolution to the dispute. By then, it was evening and very dark.

[9] As he approached Brown's front door, Spradling was joined by RPD Officer Jonathan Huth ("Huth"). Huth wore a body camera he had purchased privately and used on his own initiative.[2] The Officers stood on Brown's unlit porch, Spradling in front and Huth behind, the only light coming from a table lamp in the living room of Brown's home and the Christmas lights of neighboring homes. Spradling knocked on the front door without announcing himself. "What's this guy's deal?" Huth asked Spradling as they waited for Brown to receive them. State's Ex. 1 00:21. Spradling briefly relayed to Huth the substance of Moore's report, including her suspicion that Brown was armed.

[10] Through Brown's glass storm door and half-glass front door, Spradling observed Brown come down a flight of stairs while Huth scanned the area behind them. The stairs descended from right to left, from the Officers' perspective, and ended just a few feet from the front door. Brown's right side was therefore hidden from the Officers' view as he approached. "He's got his hand behind his back," Spradling told Huth. *Id.* at 00:32.

---

[2] The body camera's recording was played in open court at trial, admitted as State's Exhibit 1, partly transcribed in the transcript, and is part of the record before us. References to the recording are made in terms of its internal chronology, as the camera's time-and-date stamp is inaccurate. Because the scene is poorly lit and quickly became chaotic, the video portion of the recording is, for the most part, unhelpful. However, the trial court noted that it found the audio portion of the recording helpful to its decision.

Brown opened the front door, holding open the storm door with his left hand while resting his right behind the door jamb, out of the Officers' view. "What do you have behind your back there, sir?" asked Spradling. *Id.* at 00:39. "Nothing," Brown replied. "It's lying on the counter right now and it's a .357"—a popular caliber of handgun. *Id.* at 00:42. "Why don't you show me your hands," said Huth, nearly before Brown had finished his sentence. *Id.* at 00:46. Brown, without complying, began to reply, but Huth immediately interrupted him, his voice rising: "Hands up! Hands up! Hands up!" *Id.* at 00:47. "My hands are quite visible," Brown insisted. *Id.* at 00:50.

The Officers concluded that, by his refusal to show his right hand, Brown had criminally resisted law enforcement. Intending to arrest Brown for that offense but worried that he might draw a gun from his still hidden right hand, Huth drew his stun gun and fired. Seven seconds elapsed between Huth's first command and the first stun gun shot. *See id.* at 00:53 (stun gun fired).

The stun gun did not have its desired effect. Brown remained standing and took a step away from the door. Brown then tried to close the door on the Officers as the Officers tried to push their way in. After a brief struggle, Brown was overpowered and the Officers won their way inside. Spradling, now behind Huth, drew his stun gun and fired—again to no effect. Huth looked to his left and saw Brown's loaded .357 revolver, lying on a counter to the right of the front door, within Brown's reach as he had stood in the doorway. Reaching for

Brown to handcuff him, Huth was struck in the face by Brown. Huth struck him back.

[14] Huth withdrew to radio for backup while Spradling moved up from behind him to arrest Brown himself. Brown lowered his shoulder into Spradling's stomach and pushed him toward the door against a wall. Spradling felt Brown's hands at his gun holster and yelled for assistance. Huth grabbed Brown and pulled all three men backward to the ground.

[15] Once on the ground, Brown was pinned by Huth at the shoulders and by Spradling at the hips. The Officers struggled to handcuff Brown against his resistance. Spradling pushed his stun gun into Brown's back and fired yet a third time, also with no effect. Huth struck Brown several times with the butt of his stun gun. Brown was then subdued and handcuffed. The melee had lasted approximately sixty seconds. "Would you care to explain to me what is going on here?" Brown asked. *Id.* at 02:55.

[16] RPD officers responding to Huth's call for backup arrived quickly. Huth and Spradling suffered two pairs of broken glasses, a broken ear piece, bruises, and cuts. Neither required medical attention. Brown was taken by ambulance to a local hospital and treated for lacerations to his face and head.

[17] The next day, December 24, 2014, Brown was charged with battery on a public safety officer, a Level 6 felony, and disarming a public safety officer, a Level 5 felony. Brown was not charged with resisting law enforcement.

At his October 26, 2015, bench trial in Wayne Superior Court, Brown raised the defenses of self-defense and defense of his dwelling to the battery charge. After the close of evidence, the trial court ordered briefing on the issues presented by Brown's claims and took the matter under advisement. After two full weeks' consideration, on November 9, 2015, the trial court issued a written order containing its findings of fact and conclusions of law, specifically that the Officers had entered Brown's home unlawfully but Brown had entered into combat with the officers, had not resisted with reasonable force, and was therefore not protected by the defenses raised.

These findings resulted in a judgment acquitting Brown of disarming but convicting him of battery. At Brown's sentencing hearing on December 30, 2015, the judge exercised his statutory discretion to sentence the Level 6 felony as a Class A misdemeanor, carrying a sentence of up to one year, rather than the higher, Level 6 felony range of six to eighteen months. Brown was sentenced to a one-year term, all suspended to probation except time served.

This appeal followed.

## Standard of Review

Under the facts and circumstances before us, the State bore the burden below of showing that the Officers' intrusion into Brown's privacy was reasonable. *State*

*v. Gerschoffer*, 763 N.E.2d 960, 965 (Ind. 2002). In appealing[3] from the trial court's ruling that it was not, the State thus appeals from a negative judgment. *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010). A negative judgment will not be reversed on appeal unless contrary to law. *Id.* A judgment is contrary to law when the evidence is without conflict and all reasonable inferences lead to a conclusion contrary to that reached below. *Id.* Constitutionality of a search or seizure is reviewed de novo. *J.K. v. State*, 8 N.E.3d 222, 229 (Ind. Ct. App. 2014).

## Discussion and Decision

[22] By statute, a person is privileged to use reasonable force if he reasonably believes that the force is necessary to protect himself from the imminent use of unlawful force by police, prevent unlawful entry of his home by police, or terminate unlawful entry of his home by police. Ind. Code § 35-41-3-2(i)(1)–(2). These statutes were amended to privilege resistance against unlawful acts of public safety officers in response to our supreme court's decision in *Barnes v. State*, 946 N.E.2d 572 (Ind. 2011). *See Cupello v. State*, 27 N.E.3d 1122, 1124 (Ind. Ct. App. 2015).

[23] At the outset it is therefore necessary to decide whether the Officers' entry into Brown's home was lawful. The trial court concluded it was not. We disagree.

---

[3] Though the State does not in terms so designate itself, we regard it as a cross-appellant in light of its arguments inviting reversal of the trial court's ruling on a potentially dispositive issue.

The Indiana Constitution protects "[t]he right of the people to be secure in their persons [and] houses . . . against unreasonable . . . seizure . . ." Ind. Const. Art I, § 11. Although this wording is nearly identical to that of the Fourth Amendment to the federal constitution, Section 11 is interpreted and applied independently of the Fourth Amendment. *Powell v. State*, 912 N.E.2d 853, 863 (Ind. Ct. App. 2009). Our supreme court has held that, because the protections of the federal and state constitutions are not co-extensive, Section 11 must supply the more protective standard. *Shotts v. State*, 925 N.E.2d 719, 726 (Ind. 2010); *see also Oregon v. Hass*, 420 U.S. 714, 719 (1975) (federal constitution is the floor, not the ceiling, of individual rights).[4]

In evaluating the lawfulness of a seizure, Indiana courts give Section 11 a liberal construction in favor of protecting individuals from unreasonable intrusions on privacy. *Holder v. State*, 847 N.E.2d 930, 940 (Ind. 2006). At the same time, however, our courts recognize that Hoosiers are concerned not only with personal privacy but also with safety, security, and protection from crime. *Id*. To these ends, some intrusions are tolerated. *Id.*

Under Section 11, the lawfulness of police conduct is reviewed for reasonableness under the totality of the circumstances. *Moran v. State*, 644

---

[4] In addition, we note that the Fourth Amendment law of emergency is quite unsettled, *see Sutterfield v. City of Milwaukee*, 751 F.3d 542 (7th Cir. 2014), that the first-impression nature of the role of officer safety under these facts and circumstances was not recognized below, and that the arguments below and on appeal therefore have not provided our court with adequate consideration of the law in this context. For these reasons, and in view of the extremely fact-sensitive nature of such questions, we conclude that resolution of this appeal is more appropriate under Section 11.

N.E.2d 536, 539 (Ind. 1994). Reasonableness here turns on the balance of three factors: the degree of concern, suspicion, or knowledge that a criminal violation has occurred; the degree of intrusion imposed by police on the person's ordinary activities; and the extent of law enforcement needs. *Litchfield v. State*, 824 N.E.2d 356, 362 (Ind. 2005).

[27] Under the totality of the circumstances, we conclude that the Officers' limited intrusion into Brown's privacy was justified by the immediate, urgent need to protect themselves and members of the public from a man whom the Officers reasonably believed to be armed and dangerous.

[28] As to the first *Litchfield* factor, while the facts as known to the Officers as they stood on Brown's porch likely would not have given rise to a "crime" in the strict sense,[5] the conduct threatened by Brown against Smith and Moore almost certainly would have been illegal if carried out, as an unreasonable use of deadly force in defense of property. Thus the degree of suspicion that Brown had threatened to commit a crime was quite high. *See State v. Atkins*, 834 N.E.2d 1028 (Ind. Ct. App. 2005) (emphasizing need for suspicion of criminality).

[29] As to the second *Litchfield* factor, giving Brown a command which he was not free to disregard, using a stun gun, and finally arresting him in his home are

---

[5] The State argues for the first time on appeal that the Officers had probable cause to arrest Brown for intimidation as defined under I.C. § 35-42-2-1. Even were we to consider this untimely argument, it would fail for lack of a prior lawful act for which retaliation was threatened, as required by the intimidation statute. *See* I.C. § 35-45-2-1(a)(2), (b)(1)(A); *Roar v. State*, 52 N.E.3d 940, 943 (Ind. Ct. App. 2016) (adopted and incorporated by *Roar v. State*, 54 N.E.3d 1001 (Ind. 2016)).

clearly "intrusive." However, Brown freely and voluntarily answered the Officers' knock at his door, willingly surrendering his privacy to whoever stood outside. Moreover, the Officers were careful in matching their escalating conduct to the escalating urgency of the situation confronting them. In a tense, uncertain situation which could have had fatal results, the Officers responsibly deployed less than lethal force. Thus their intrusion on Brown's freely surrendered privacy was as narrow and as limited as the situation would allow.

[30] The third *Litchfield* factor is decisive here, and has not been accorded adequate weight by Brown or by the court below. First, this court has repeatedly emphasized that "[o]fficer safety is *always* a legitimate concern." *State v. Atkins*, 834 N.E.2d 1028, 1033 (Ind. Ct. App. 2005) (emphasis added). *See also, e.g., Woodson v. State*, 966 N.E.2d 780, 786 (Ind. Ct. App. 2012) (detention of suspects at gun point justified by "the obvious need to maintain officer safety"). It would be entirely unreasonable to require the Officers to turn their backs on a man whom they believed to be armed, who was totally noncompliant in response to their commands, and who had threatened just hours earlier to commit a horrific act of violence on two innocent neighbors.

[31] Second, Brown's refusal to submit to the Officers created an emergency to which the Officers were justified in responding. *Holder v. State*, 847 N.E.2d 930 (Ind. 2006).[6] In *Holder*, our supreme court held that it was reasonable for police

---

[6] We use the ordinary word "emergency" in order to avoid the confusion surrounding the "exigent circumstances," "emergency aid," and "community caretaking" doctrines in the Fourth Amendment context.

to enter a home from which they detected a strong smell of ether, consistent with the presence of a methamphetamine manufacturing lab on the property. In order to protect the public from the danger of imminent explosion, the *Holder* court held that it was reasonable under Section 11 for the police to enter a home to avert the danger posed by the emergency. 847 N.E.2d at 941.

Here, Brown's conduct created a similar emergency. With the loaded revolver within Brown's grasping distance, the Officers were mere moments away from a fatal encounter as they stood on Brown's porch. This emergency was heightened by the possibility of mental instability evidenced by Brown's irrational conduct and noted by Huth when he asked Spradling, "What's this guy's deal?" Brown could have defused the emergency created by his own conduct by simply complying with the Officers' reasonable request to see his hands. Although Brown's words indicated compliance, the Officers did not see and could not confirm compliance in the dark and were justified in taking steps to end the emergency themselves.

Third, Smith and Moore required the Officers' protection as well. Given the possibility of Brown's mental instability, neither the Officers nor Moore and Smith could feel certain that Brown would not escalate the situation further after the Officers left the scene.

Finally, a contrary holding would not serve our shared goal of community policing. *See R.H. v. State*, 916 N.E.2d 160, 268 (Ind. Ct. App. 2009) (Mathias, J., concurring) ("A healthy, civil society is most robust when it feels safe and

when that feeling of safety is validated through interaction with vigilant and responsive law enforcement engaged in the important business of policing neighborhoods within a community."). To require the Officers to turn their backs on an armed and potentially unstable man was not safe for the Officers, would not promote a feeling of safety in Brown's small-town community, and would deprive innocents like Moore and Smith of the "vigilant and responsive law enforcement" which is a necessary condition of a healthy, civil society.

[35] Under the totality of these specific facts and circumstances, we hold that the Officers' conduct was reasonable and thus lawful. Accordingly, there is no need to reach the question, as the trial court did, of whether Brown acted with reasonable force in self-defense.

[36] Affirmed.

Bradford, J., and Altice, J., concur.