## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 27 2019, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Earl B. Martin,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

November 27, 2019

Court of Appeals Case No.
19A-CR-627

Appeal from the Vanderburgh
Circuit Court

The Honorable David D. Kiely,
Judge

Trial Court Cause No.
82C01-1712-MR-7874

**Brown, Judge.**

[1] Earl B. Martin appeals his convictions for murder, attempted murder, two counts of robbery, and conspiracy to commit robbery. We consolidate the issues he raises as whether the trial court abused its discretion or erred in admitting certain evidence. We affirm.

### Facts and Procedural History

[2] In December 2017, Martin communicated with his co-worker, Jalil Fellows, via text messages. Martin asked Fellows if he knew someone they could rob, and Fellows gave Martin the phone number for his marijuana supplier, Brandon Waldroup. Fellows believed that Martin was going to rob Waldroup of a half-pound of marijuana and they would split it in some way.

[3] On December 18, 2017, Miranda Grissom, Martin's friend, picked him up from his mother's house around 4:00 or 5:00 p.m. and took him to her apartment located across the street from Rick's Sports Bar. Grissom observed that Martin had a gun. A couple of hours later, Martin left with the gun and said he was going to Rick's to meet his girlfriend.

[4] That same day, Waldroup exchanged text messages with a person calling himself Jeremiah. They decided to meet at Rick's Bar, and Waldroup drove to the bar with Christopher Hoefling. Waldroup heard a tap on the rear passenger door, unlocked the car, and Martin opened the door and pointed a gun at Waldroup's head and a second gun at Hoefling's head. Waldroup turned his head back around, heard a gunshot, and was then struck by a second shot. A few seconds later, Waldroup saw his car door open, and Martin pulled him out

of the car and threw him face down on the concrete. Waldroup laid in pain for awhile before turning his head to see that his car and Hoefling were gone.

[5] A passerby approached Waldroup, and officers arrived at the scene. Waldroup was able to give the officers a description of his vehicle and the person who shot him as an older black male with a tan jacket. Waldroup was unable to tell the police if Hoefling had been shot.

[6] Evansville Police Detective David Smith sent officers to speak with Hoefling's father and then to Waldroup's apartment to look for Hoefling. Detective Smith went through the process with Blue Link to locate Waldroup's car but was unsuccessful.[1] He then contacted AT&T regarding Waldroup's phone, received an emergency disclosure, discovered that the phone had been turned off moments after the incident, and learned that two phone numbers were of interest and belonged to Fellows and Martin.

[7] Waldroup was transported to the hospital and had a bullet removed from his jaw. While he was in the hospital, he identified Martin from a photo array as the person who shot him. Evansville Police Detective Peter DeYoung spoke with Waldroup and learned that Waldroup's phone was likely in the vehicle and that there was a second victim. He contacted the phone carrier and asked

---

[1] Detective Smith testified that Waldroup's father thought the car had Onstar and that he ultimately determined that the brand of Waldroup's vehicle used Blue Link.

for an exigent circumstances tracking of the phone so he could locate the second victim.

[8]     Meanwhile, at some point that evening, Martin's girlfriend, Heather Wilson, called him, and he asked her for a ride but did not seem to know where he was and gave her the names of the intersecting streets. Wilson picked him up in a red PT Cruiser, noticed he smelled of marijuana, and dropped him off at his mother's home.

[9]     Martin called Fellows and said it "turned out bad" and Fellows would "see it on the news." Transcript Volume II at 120. That night, Fellows went to Martin's house and obtained three ounces of marijuana.

[10]    Around 10:00 or 11:00 p.m., Martin called Grissom and asked her to pick him up at his mother's house. She picked him up, noticed that he had marijuana with him, and returned him to his mother's house around 7:30 a.m. the following morning.

[11]    On December 19, 2017, Detective Smith told Evansville Police Detective Brad Evrard that he had a number for one of the victim's phones. They contacted the cell provider and obtained information regarding two phone numbers that were communicating with Waldroup's phone. Detective Evrard entered the phone numbers into Facebook and discovered that one number belonged to Fellows and the other belonged to Martin. He took the numbers for Fellows and Martin and "did an exigent warrant to Verizon." *Id.* at 246.

[12]    The police searched for Waldroup's vehicle that day but did not find it. That afternoon, they executed a search warrant on the home of Martin's mother. Police discovered a .380 caliber Cobra handgun and a .22 caliber Ruger pistol. They discovered a velvet Crown Royal bag containing eighteen rounds of federal .380 caliber ammunition, a firearm, a Carhartt jacket, and marijuana in a bag in a trash can of a neighboring home. Police collected jeans from a bedroom with blood on the seat, a pair of work boots, two .380 caliber spent shell casings, and a box of .25 caliber ammunition from the northeast bedroom.

[13]    Evansville Police Detective Jeffrey Allen Hands informed FBI Special Agent Kevin Horan of the missing vehicle and that there was another victim. Agent Horan created a report for the Verizon phone number believed to belong to Martin.

[14]    On December 19, 2017, the police recovered Waldroup's vehicle and discovered Hoefling's body inside. After a search warrant was obtained for the vehicle, the police discovered a spent .380 caliber shell casing, a small baggie of suspected marijuana, and a .22 caliber shell casing. An autopsy revealed Hoefling suffered four gunshot wounds to his back and died as a result of a large accumulation of blood in the right chest cavity caused by one of the gunshot wounds.

[15]    On December 26, 2017, the State charged Martin with Count I, murder; Count II, murder; Count III, attempted murder as a level 1 felony; Count IV, robbery resulting in serious bodily injury as a level 2 felony; Count V, robbery resulting

in serious bodily injury as a level 2 felony; and Count VI, conspiracy to commit robbery as a level 5 felony. The State also alleged a sentencing enhancement for a person committing a felony offense while using a firearm as to Counts I, II, IV, and V, and that he was an habitual offender.

[16] Martin sent a letter dated March 13, 2018, to Grissom in which he stated "the only reason your [sic] not wrapped up in this is because of me," that he needed her to move a package, if she ignored him then "I swear to God your [sic] done!," and "So make your next move your best move my Queen. Lol One more thing. Check mate." State's Exhibit 28.

[17] On December 3, 2018, Martin filed a motion to suppress alleging that the Evansville Police Department requested and received his cell phone records from Verizon Wireless pursuant to an "Emergency Disclosure" request and that this demand violated his rights. Appellant's Appendix Volume II at 169. The trial court held a hearing on the motion to suppress and denied the motion.

[18] In January 2019, the court held a jury trial. Fellows testified about his communications with Martin and that Martin called him and said it "turned out bad" and he would "see it on the news." Transcript Volume II at 120. Waldroup testified that Martin entered the car with guns drawn, shot him in the face, and pulled him out of the car. He immediately identified Martin as the shooter in the photo array on the day after the shooting and with a "hundred percent" certainty during his testimony in court. *Id.* at 167. Heather Wilson, Martin's girlfriend until the time of the robbery, testified that she did not discuss

with Martin about going to Rick's Sports Bar that day. The court admitted a surveillance video recording from a liquor store near the scene of the shooting which showed a male walking through a parking lot wearing a tan jacket at approximately 8:51 p.m.

[19] Erin Gabor, an IT Specialist Computer Forensic Examiner employed by the FBI, prepared a report regarding Martin's phone titled Extraction Report and refers to the Federal Bureau of Investigation Computer Analysis Response Team. The court admitted the 2,770-page report as State's Exhibit 31 over Martin's objection. Gabor testified that the report included information from the cell phone given to her in the investigation.

[20] Evansville Police Officer Douglas Hamner testified that he used a chemical known as bluestar on the PT Cruiser which reacts to the presence of hemoglobin and blood. He observed a reaction on the front passenger seat, the outside front passenger door handle area, and the front passenger inside door handle.

[21] Outside the jury's presence, Agent Horan testified he is a cell phone expert and that he provided a report to the Evansville Police Department containing an expert opinion about the movement of Martin's phone on the evening of the crime. He explained that the report is generated from inputting the Verizon records into a software program. Martin's counsel argued that Verizon did not provide a business records affidavit or certify the records. Agent Horan testified that he was a member of the cellular analysis survey team and had been trained

"in almost all things, cell phone . . . ." Transcript Volume III at 159. Martin's counsel later stated: "I'm not contesting whether he's qualified. I'm contesting that the data he relied upon, which is in substance his map, is not authenticated." *Id.* at 166. He also objected under Ind. Evidence Rules 803 and 901.

[22] In the presence of the jury, Agent Horan testified that he received specialized training and was assigned to the Cellular Analysis Survey Team, which is a group of experts in the field of cellular technology and cellular tracking. During Agent Horan's testimony, Martin's counsel objected to the admission of the report prepared by him. The court overruled the objection, and admitted the report as State's Exhibit 232. Agent Horan testified as to the report and location of the phone during certain times on December 18, 2017.

[23] Mitzi Templeton, a forensic firearm and toolmark examiner, testified that a bullet retrieved from Hoefling's body during the autopsy was fired from the Cobra .380 caliber firearm. She indicated that a .380 caliber shell casing recovered from Waldroup's vehicle and two .380 caliber shell casings recovered from the residence of Martin's mother were fired from the Cobra .380 caliber firearm.

[24] Nicole Huffman, a forensic scientist, testified she detected human blood on a swab of the recovered tan jacket. She testified that the DNA profile was "at least one trillion times more likely if it originated from Earl Martin and Brandon Scott Waldroup rather than originating from Earl Martin and an

unknown individual," and that "[t]hat analysis provides very strong support for the explanation that Brandon Scott Waldroup is a contributor to the DNA profile." *Id.* at 223. With respect to a swab from Martin's boots, Huffman detected blood and testified that "[t]he DNA profile developed was interpreted as originating from a single individual and the DNA profile is at least one trillion times more likely if it originated from Brandon Scott Waldroup than if it originated from an unknown unrelated individual," and "this analysis provides very strong support for the explanation that Brandon Scoot [sic] Waldroup is a contributor to the DNA profile." *Id.* at 229.

[25] Huffman testified that the DNA profiles developed from four cuttings of Martin's shirt were each interpreted as originating from a single individual, that the DNA profile was "at least one trillion times more likely if it originated from Brandon Scott Waldroup than if it originated from an unknown unrelated individual," and "[t]his analysis provides very strong support for the explanation that Brandon Scott Waldroup is a contributor to the DNA profile." *Id.* at 230. With respect to a fifth cutting from the shirt, she developed a DNA profile and interpreted it as originating from three individuals, the DNA profile was "at least one trillion more times likely if it originated from Earl Martin, Brandon Scott Waldroup, and an unknown unrelated individual rather than if it originated from Earl Martin and two unknown individuals," and "[t]his analysis provides very strong support for the explanation that Brandon Scott Waldroup is a contributor to the DNA profile." *Id.* at 230-231. She gave

similar testimony regarding a sixth cutting from the shirt, Martin's underwear, and Martin's blue shorts.

[26] On cross-examination, Martin's counsel asked Huffman if when she said somebody is one trillion times more likely to be the contributor that "we're basically saying to this jury that you're pretty certain that that's the person's DNA," and she replied: "We're saying that the DNA profile I developed is best explained by that situation, like that, it's best supported by that explanation versus another. We're actually comparing two different scenarios and saying this is more likely than that." *Id.* at 233. When asked if a swab of a dried red substance in front of the tan jacket that she understood belonged to Martin was human blood, she answered affirmatively. Martin's counsel asked: "No question based upon your analysis that the contributors to that DNA profile were Mr. Martin and Mr. Waldroup. Is that right?" *Id.* at 236. Huffman answered: "My reports are a trillion more times likely that that is where they originated from." *Id.* at 236.

[27] Susan Laine, a forensic DNA analyst, testified that she tested the swab from the slide of the Ruger, found human blood, determined that the DNA profile originated from a single individual and that "the profile was at least one trillion times more likely if it originated from Christopher Leo Hoefling than if it originated from an unknown unrelated individual." *Id.* at 248.

[28] Detective Hands testified that Verizon sent records and identified them as State's Exhibit 240. Upon questioning by Martin's counsel, Detective Hands

indicated that the file from Verizon was encrypted, that Verizon provides instructions on how to open and authenticate it, and that the file was sent to Detective Smith's email. Martin's counsel objected on the basis of Ind. Evidence Rules 901 and 803(6). After some discussion, the court sustained the objection. Detective Hands then identified State's Exhibit 31 as a CD containing the download of Martin's phone that was sent to the FBI with the search warrant. The court indicated that the exhibit had already been admitted, Martin's counsel renewed his objection, and the court overruled the objection.

[29] After the State rested, Martin presented the testimony of Brandon Cox who testified that he lived in Mt. Vernon, Indiana, had a Ruger SR 22 semi-automatic pistol for sale in November 2017, listed it on a website, and ultimately sold it to Hoefling.

[30] The jury found Martin guilty as charged, and he later admitted to the firearm sentencing enhancements and to being an habitual offender. The court found that Count II merged with Count I and sentenced him to an aggregate sentence of 135 years.

## Discussion

[31] The issue is whether the trial court abused its discretion or erred in admitting certain evidence. Martin argues that the cell phone records were not properly authenticated and were inadmissible under Ind. Evidence Rule 901(a) and points to State's Exhibits 31 and 232. He contends that the erroneous admission of the evidence was not harmless because the records had a

substantial effect on the jury's deliberations. He also points to Ind. Evidence Rule 803(6) and asserts that his phone records and the map and testimony generated from them constitute impermissible hearsay and its admission violated his right of confrontation. He argues that the business records were compiled by the FBI to show his movements on the day of the shooting and Agent Horan admitted that he used this information to create a map and provide a location of his phone at the relevant times. He contends that he had no way to cross-examine the custodian of the data underlying the map and no ability to confront the State about the accuracy of the information generated by the FBI agent. He also argues that his cell phone and the cellular location evidence related to his phone were seized in violation of the Fourth Amendment.

[32] The State argues that the cell phone records were not admitted into evidence, that Agent Horan authenticated the report he prepared, and that an expert is permitted to rely upon inadmissible evidence in reaching conclusions. It also argues that any error in admitting the evidence over the Rule 901 and Rule 803 objections was harmless given the overwhelming evidence of guilt and relative insignificance of the cell phone location evidence. It contends that no warrant was required under the exigent circumstances exception and the officers acted in good-faith reliance on then-controlling precedent that a warrant was not required.

[33] The trial court has broad discretion to rule on the admissibility of evidence. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). A trial court's ruling on the

admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016). We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* at 1059. An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.*

[34] Initially, we note that the trial court did not admit the cell phone records. Rather, Martin points to State's Exhibit 232, which is Agent Horan's report of his analysis drawing his conclusions about the location of the phone at various times and is titled "FBI Cellular Analysis Survey Team," and State's Exhibit 31, which includes FBI Examiner Gabor's report of her extraction of the data on Martin's cell phone conducted pursuant to a search warrant. State's Exhibit 232. Agent Horan identified State's Exhibit 232 as his report at trial. Ind. Evidence Rule 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field."

To the extent Martin cites *Carpenter v. United States*, 138 S. Ct. 2206, 2217-2218 (2018), we cannot say that case requires reversal. In *Carpenter*, police officers arrested four men suspected of robbing multiple stores in Michigan and Ohio. 138 S. Ct. at 2212. One of the men confessed that, over the previous four months, the group had robbed nine different stores and identified fifteen accomplices and gave the FBI some of their cell phone numbers. *Id.* Based on that information, the prosecutors applied for court orders under the Stored Communications Act to obtain cell phone records for Carpenter and several other suspects. *Id.* The Court addressed the question of whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements. 138 S. Ct. at 2211. The Court observed that the government acquired the cell-site records pursuant to a court order issued under the Stored Communications Act, which required the government to show "reasonable grounds" for believing that the records were "relevant and material to an ongoing investigation." *Id.* at 2221. The Court held that "[t]hat showing falls well short of the probable cause required for a warrant." *Id.* The Court recognized:

> Further, even though the Government will generally need a warrant to access [cell-site location information ("CSLI")], case-specific exceptions may support a warrantless search of an individual's cell-site records under certain circumstances. "One well-recognized exception applies when '"the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct.

1849, 179 L.Ed.2d 865 (2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L.Ed.2d 290 (1978)). Such exigencies include the need to pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence. 563 U.S., at 460, and n. 3, 131 S. Ct. 1849.

As a result, if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of CSLI. Lower courts, for instance, have approved warrantless searches related to bomb threats, active shootings, and child abductions. Our decision today does not call into doubt warrantless access to CSLI in such circumstances. While police must get a warrant when collecting CSLI to assist in the mine-run criminal investigation, the rule we set forth does not limit their ability to respond to an ongoing emergency.

*Id.* at 2222-2223.

[36] The Indiana Supreme Court has held that exigent circumstances that have been found sufficient to overcome a warrantless entry have included: (1) a suspect is fleeing or likely to take flight in order to avoid arrest; (2) incriminating evidence is in jeopardy of being destroyed or removed unless an immediate arrest is made; and (3) hot pursuit or movable vehicles are involved. *Snellgrove v. State*, 569 N.E.2d 337 (Ind. 1991). The Court has also recognized an "emergency circumstances" exception to the warrant requirement when a violent crime has occurred and entry by police can be justified as a means to prevent further injury or to aid those who have been injured. *Sapen v. State*, 869 N.E.2d 1273, 1277 (Ind. Ct. App. 2007) (quoting *Snellgrove*, 569 N.E.2d at 340 (citing *Tata v. State*, 486 N.E.2d 1025, 1028 (Ind. 1986))), *trans. denied*. Further, "[a]mong the

exigencies that may properly excuse the warrant requirement are threats to the lives and safety of officers and others and the imminent destruction of evidence." *Holder v. State*, 847 N.E.2d 930, 937 (Ind. 2006).

[37] The record indicates that Martin fired multiple shots, shot Waldroup, pulled him out of his car, threw him face down on the concrete, and left the scene with Hoefling. Given that law enforcement was attempting to find Hoefling, we conclude that exigent circumstances existed. *See Johnson v. State*, 117 N.E.3d 581, 585 (Ind. Ct. App. 2018) (holding that the police were investigating a murder and that a threat to the lives and safety of others and possible destruction of evidence were sufficient exigent circumstances to justify obtaining cellular location information without a court order and that the defendant had not shown a violation of his federal constitutional rights), *trans. denied*; *Govan v. State*, 116 N.E.3d 1165, 1174 (Ind. Ct. App. 2019) (holding that the police had ample reason to believe that the defendant had committed violent felonies and presented an ongoing threat to the lives and safety of others and had reason to believe that obtaining real-time data about the location of the defendant's cellular phone would assist them in finding him and that these were sufficient exigent circumstances under the Fourth Amendment to justify obtaining real-time phone location information without first seeking a court order), *trans. denied*.

[38] Moreover, the record reveals substantial independent evidence of guilt set forth above. Grissom testified that she picked up Martin the day of the shooting and took him to her apartment which was across the street from Rick's Sports Bar.

Waldroup immediately identified Martin as the shooter in the photo array after the shooting and with "a hundred percent" certainty during his testimony in court. Transcript Volume II at 167. The court admitted surveillance video from the liquor store near the scene in which a male walked through a parking lot wearing a tan jacket at approximately 8:51 p.m. The record includes testimony regarding the DNA profiles found on the tan jacket and Martin's boots, shirt, underwear and shirts. Based upon this evidence as well as the ballistics evidence and other evidence in the record, we conclude that any error was harmless. *See Zanders v. State*, 118 N.E.3d 736, 756 (Ind. 2019) ("In light of the Supreme Court's decision in *Carpenter*, we hold that the State's access to Zanders's historical CSLI was a Fourth Amendment search. We also hold that, regardless of whether the search falls under the exigent-circumstances exception to the Fourth Amendment's warrant requirement, the admission of the CSLI evidence was harmless beyond a reasonable doubt.").

[39] For the foregoing reasons, we affirm Martin's convictions.

Affirmed.

Altice, J., and Tavitas, J., concur.