

**FILED**

Jan 24 2019, 9:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Brian Woodward
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas Jeffrie Snow,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

January 24, 2019

Court of Appeals Case No.
18A-CR-578

Appeal from the Lake Superior
Court

The Honorable Samuel L. Cappas,
Judge

Trial Court Cause Nos.
45G04-1408-FD-137
45G04-1404-MR-3

**Tavitas, Judge.**

## Case Summary

[1] Thomas Snow appeals his convictions for two counts of murder after a jury convicted him of murdering his parents.[1] We affirm.

## Issues

[2] Snow presents several issues on appeal, which we consolidate and restate as follows:

> I. Whether the trial court properly admitted evidence found during a search of the victims' residence in which Snow also resided.
>
> II. Whether there was sufficient evidence to convict Snow of murder.

## Facts

[3] Clifford Snow ("Clifford") and Joyce Snow ("Joyce") owned a residence in Lowell, Indiana (the "residence"). Snow, their son, lived with them. Julie Niemeyer, Snow's sister and Clifford and Joyce's daughter, lived in Missouri. Niemeyer spoke with her parents by telephone once per month and visited her parents at the residence two or three times per year. Niemeyer spoke with Joyce on August 27, 2013, and Clifford on September 11, 2013. Typically,

---

[1] Snow was also convicted of resisting law enforcement, a Class D felony; habitual traffic violator, a Class D felony; and two counts of reckless driving, Class B misdemeanors. Snow does not appeal those convictions.

Clifford and Joyce called Niemeyer on her birthday—September 30th—however, on September 30, 2013, Niemeyer did not hear from her parents.

[4] The next day, on October 1, Niemeyer telephoned her parents. Snow answered and stated that Clifford and Joyce were out walking the dogs. Snow also told Niemeyer that he installed security cameras in the residence due to area break-ins. Niemeyer asked Snow to have Clifford and Joyce return her call, but they never did.

[5] Also on October 1, Snow stopped by the home of Dennis and Samantha Roper, friends of Clifford and Joyce. Snow told the Ropers that his parents were out of town in Germany for a couple of weeks. At the time, Dennis was surprised to hear the news, as Clifford did not enjoy traveling or flying "that great of a distance." [2] Tr. Vol. II p. 72. Snow also told Dennis that there was a "major septic backup" in the basement of the residence. *Id.* at 76. Snow told Dennis he did not "want nobody [sic] down there until [Snow got] this cleaned up and resolved." [3] *Id.* at 77. That day, Dennis observed Snow driving Clifford's GMC truck, which was unusual. [4]

---

[2] Niemeyer testified that her parents would not leave the country without telling her. Niemeyer also testified that her mother was "deathly afraid of heights" and would not get on an airplane. Tr. Vol. II p. 197.

[3] A septic company did go to the residence on September 30 to look at the septic tank. The individual from the septic company who went to the residence testified the job was "normal." Tr. Vol. VI p. 73. Snow paid for the service using checks belonging to Clifford and Joyce.

[4] There were two primary vehicles that Dennis knew belonged to Clifford. Specifically, Dennis was aware of a white Chevy HHR vehicle and a GMC pickup truck.

[6] Snow also told other neighbors similar stories regarding Clifford's and Joyce's out of town trip. Snow asked neighbors to let Snow know if anything looked out of the ordinary at the residence. Snow also asked to shower at the neighbors' house because of the septic issue; the neighbors declined. Snow told a former neighbor that Clifford died of a heart attack while mowing the lawn and that Joyce travelled to Missouri to be with Niemeyer after Clifford's death.[5]

[7] On October 5, 2013, Officer Laurie Reilly of the Lake County Sheriff's Department stopped a vehicle that was improperly towing another vehicle. Snow was in the lead vehicle, and Joey Montgomery was in the towed vehicle. Snow and Montgomery knew one another because Snow often purchased crack cocaine from Montgomery. While Officer Reilly checked Snow's and Montgomery's information in her squad car, Snow detached the two vehicles and drove away, leading officers on a pursuit that continued through a residential area. Snow led the officers through a cornfield before Snow was able to get away. Officers went to the residence immediately afterwards, but did not find Snow there.[6] One of Clifford's trucks was later found in Ford Heights, Illinois, with corn stalks and garbage bags in the truck bed. The garbage bag contained a cordless phone, a pillow case, gym shoes, various clothes, and a drill.

---

[5] Snow told another neighbor that Clifford died in his sleep.

[6] The residence was the address to which the truck Snow was driving was registered.

[8]     On Friday, October 18, a cousin contacted Niemeyer and expressed concern for Clifford. The cousin heard that Clifford died, and the cousin was unable to contact Joyce. Niemeyer attempted unsuccessfully to reach her parents and Snow. Niemeyer ultimately contacted the Lake County Sheriff's Department and requested a welfare check. Officers David Crane, Bryan Kersey, Louie Garcia, and Mike Reilly were dispatched to the residence.

[9]     After walking around the outside of the house, officers reported to Niemeyer that they saw a dumpster in the front yard, the dogs barking in the window, and several unopened newspapers piled in the driveway. Officer Crane previously visited the residence between October 5 and October 18 to look for Snow and encountered no one on the property.

[10]    Officers did not get a response when they knocked on the doors. Niemeyer was alarmed that the property was in disarray because Clifford kept the yard neat. Niemeyer acknowledged that she never lived in the residence.[7] Niemeyer directed officers to enter the house, even if that meant breaking down the door.

[11]    The officers ultimately made forced entry by kicking in a door. Immediately, the officers identified "a strong pungent odor of decomposition," and dog feces. Tr. Vol. III p. 3. The officers began checking the house to determine whether there was anyone inside the house who needed assistance. While placing the

[7] Although Niemeyer never lived in the residence, Niemeyer would visit on summer breaks, as her family moved to the residence after she went to college.

dogs in the kennel, the officers noticed a pile of debris in the garage, including a tarp and rolled up carpet, with an unknown fluid seeping from the pile.

[12] In the bathroom at the top of the stairs, officers saw another large pile of carpet in the bathtub. The shower curtain was pulled down, and a bag of cat litter was poured over the debris. The officers identified blood on the bathroom floor. Officers were able to identify the body of a female in the bathroom. Officers returned to the garage and observed that the debris was covered in blood and maggots.

[13] At this point, officers determined the scene would require a crime scene technician; they exited the residence and contacted detectives and the crime lab. Officers secured the scene and searched the wooded area around the house.

[14] Dennis Eaton, a division commander, subsequently arrived at the residence. Commander Eaton was informed there was at least one decedent in the residence, who was presumed to be a homicide victim. Commander Eaton obtained a search warrant. The officers then conducted a complete search of the residence.

[15] The residence was in various states of disarray, with dead animals, animal feces, and piles of clothes throughout. In the laundry room, officers observed, among other things, a tarp, and unidentified stains on the washer and dryer. In the garage, where Clifford's body was found, there were flies all over the window.

[16] Both victims' bodies were badly decomposed. Officers were not able to tell if anyone had been at the house recently; however, it appeared that someone was recently in the pole barn. The lights and the radio were on, and officers located pants and bloody latex gloves in the pole barn.

[17] The search for Snow intensified. On October 19, Snow was detained in Minnesota while driving a white Chevy HHR truck registered to Clifford.[8] Lake County officers picked Snow up from police in Minnesota. The officers retrieved carbon copies of checks, several credit cards, a hotel room key, pawn receipts, receipts from a Super 8 motel, and several maps from the truck.

[18] The State charged Snow with Count I, murder; Count II, murder; Count III, resisting law enforcement, a Class D felony; Count IV, habitual traffic violator, a Class D felony; Count V, reckless driving, a Class B misdemeanor; and Count VI, reckless driving, a Class B misdemeanor. Prior to trial, Snow moved to suppress the evidence found in the residence, arguing a Fourth Amendment violation. Snow's trial counsel continually objected to the introduction of

---

[8] Officers in Minnesota attempted to initiate a traffic stop, which ultimately resulted in Snow leading officers on a high-speed chase at speeds around 110 to 115 miles per hour. Snow told the officer his name was "Jack the Ripper." Tr. Vol. VII p. 29. Snow told officers that he was given permission from his dad the day before to drive his vehicle. Officers believed Snow to be "under the influence of something." *Id.* at 30. Officers performed a portable breath test, which came back negative for any alcohol; however, officers could see two glass smoking pipes in plain view in Snow's car that appeared to be for smoking methamphetamine. Snow told officers that he had not slept in over two weeks and that he was hearing voices. Officers learned that Snow was wanted for murder in Indiana.

evidence found in the residence on the same basis as asserted in the motion to suppress.

[19] At trial, Dr. Neal Haskell testified as a "forensic entomology consultant." Tr. Vol. V p. 18. Dr. Haskell opined on the time of death based on the conditions of the bodies and the insects found in the residence. Dr. Haskell testified that the "date of colonization" for the insects found in the residence and on Clifford and Joyce were between September 18, 2013, and September 21, 2013.[9] Accordingly, Dr. Haskell opined, that the date of death was likely one to two days before the date of colonization.

[20] The State presented evidence that Snow continually used Clifford's and Joyce's credit cards and checks after their deaths. At the end of September and beginning of October 2013, Snow also wrote several checks from Clifford's and Joyce's checkbook to himself and Montgomery.

[21] Niemeyer testified that she went in the residence after police were finished with the property. Niemeyer noticed that there were "little to no electronics left in the home." Tr. Vol. II p. 152. Niemeyer also found Clifford's and Joyce's checks under the mattress in Snow's bedroom. Snow's name was on a pawn

---

[9]Dr. Haskell testified that the "date of colonization" as to Joyce could have been as late as September 22, 2013, but also indicated that the "range in time since death in no way suggests a different time of death between the two victims." Tr. Vol. V pp. 65-66.

shop receipt at the business where some of the electronics were later found. Snow's fingerprint was also found on the receipt.[10]

[22] Niemeyer also noted that her parents' stash of cash, including foreign currency, was missing. Niemeyer found "lots of drug paraphernalia," including six or seven pipes in the pole barn. Niemeyer found similar items in Snow's room. Clifford's bank card, Clifford's driver's license, and Clifford's social security card were found in the vehicle that police returned to Niemeyer.

[23] Surveillance footage from the residence also showed Snow walking into the residence with paint cans on September 30. The family room appeared as if work was being done; the carpet was torn up, and the glass door was recently cleaned. In addition, a fresh coat of paint appeared to be started on the wall. Despite this attempted clean-up, the State's blood splatter expert testified that: "It's reasonable and logical to determine that bloodletting[11] initiated on the chairs, and then [the decedents] ended up on the floor." Tr. Vol. XII p. 147. The blood splatter expert concluded that it was reasonable to believe that both victims died in the family room.

---

[10] The receipts from the pawn shop were dated September 27, 2013, and October 15, 2013.

[11] The blood splatter expert testified that bloodletting "can be anything . . . or anywhere on the body by an instrument or a fist or a foot or causing blood to take flight. But the bottom line is, there has to be blood—a wet blood source available that's being impacted by whatever is causing that blood to take flight. So that's a bloodletting event." Tr. Vol. XII pp. 107-08.

[24] Dr. Young Kim testified[12] that marks on Clifford's neck were consistent with ligature strangulation, which Dr. Kim attributed to a cable wire around the neck. Dr. Kim also indicated that Clifford had a "large gaping fracture" on the left side of the back of the head, which indicated exterior trauma, in addition to six round holes. Tr. Vol. IV at 68. While Dr. Kim was unable to indicate what instrument would cause the six round holes, he stated it was "likely something that can drill." *Id.* at 70. As to the gaping hole, Dr. Kim believed it was caused by blunt force trauma. Dr. Kim indicated that Clifford died as a result of the fracture to the head and strangulation.

[25] As for Joyce, Dr. Kim testified that her body was "badly decomposed" and noted a ligature mark on the neck and several fractures in the skull. *Id.* at 94. Dr. Kim also noted that the two round-shaped fracture holes in Joyce's head were similar to the holes found in Clifford's head. At the time of the autopsy, a cord was still wrapped around Joyce's neck and a cord was wrapped around her feet. Dr. Kim testified that Joyce's cause of death was strangulation and fracture of the skull.

[26] Stephen Nawrocki, the state's expert, testified that: (1) Clifford suffered a minimum of twenty-six separate blows to the head; (2) a screwdriver, or similar item, was used to create the damage to Clifford's skull; (3) the same item used to damage Clifford's skull was also used on Joyce; and (4) a hammer or some

---

[12] Dr. Kim's deposition was read at the trial.

other similar object could have caused the victims' skull fractures. The murder weapon was never identified.

[27] The jury found Snow guilty of all counts as charged. Snow now appeals.

## Analysis

### I. *Admission of Evidence*

[28] Snow first argues that the officers' warrantless entry of the residence violated his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Because Snow appeals from a completed jury trial, the issue is more appropriately framed as whether the trial court properly admitted the evidence at trial. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). "The general admission of evidence at trial is a matter we leave to the discretion of the trial court." *Id.* at 259-60. "We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* at 260.

### A. Fourth Amendment

[29] Snow first argues that the officers' warrantless entry of the residence violated his rights under the Fourth Amendment to the United States Constitution. The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures by prohibiting them without a warrant supported by probable cause. U.S. Const. amend. IV. "The fundamental purpose of the Fourth Amendment to the United States Constitution is to

protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006). This protection has been "extended to the states through the Fourteenth Amendment." *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016). "As a deterrent mechanism, evidence obtained in violation of this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception." *Clark*, 994 N.E.2d at 260. "When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search." *Bradley*, 54 N.E.3d at 999.

[30] Both Snow and the State focus their arguments on whether exigent circumstances existed to justify a warrantless search of the residence. "A well-recognized exception [to the presumption that warrantless searches and seizures inside the home are unreasonable] is the existence of exigent circumstances." *Jones v. State,* 54 N.E.3d 1033, 1036 (Ind. Ct. App. 2016) (citing *Collins v. State,* 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*), *trans. denied.*

[31] "Under [the exigent circumstances] exception, police officers may enter a residence if the situation suggests a reasonable belief of risk of bodily harm or death, a person in need of assistance, a need to protect private property, or actual or imminent destruction or removal of evidence before a search warrant may be obtained." *Jones,* 54 N.E.3d at 1036 (citing *Scott v. State,* 803 N.E.2d 1231, 1235-36 (Ind. Ct. App. 2004)). "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."

*Michigan v. Fisher,* 558 U.S. 45, 49, 130 S.Ct. 546, 549 (2009). The test is not what the individual officers believed, "but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* (citing *Brigham City v. Stuart,* 547 U.S. 398, 399, 126 S. Ct. 1943, 1945 (2006)).

[32] Snow cites *Geimer v. State,* 591 N.E.2d 1016 (Ind. 1992), which has a similar set of facts. In *Geimer,* the victim's daughter-in-law contacted police because she was concerned about his whereabouts. 591 N.E.2d at 1017. The daughter-in-law asked police to meet her husband (the victim's son) at the victim's residence. *Id.* The victim's son told police it would have been odd for the victim to leave town without notifying anyone, and that the son was concerned Geimer told several different people varying stories regarding the victim's absence. *Id.* The victim's son decided to break into the home with police present. *Id.* Our supreme court held that the warrantless search was not improper under the circumstances and accordingly, the evidence seized from the house was admissible. *Id.* at 1019. Snow attempts to distinguish the present case from *Geimer* based on the mere difference in the facts here, no one met the police officers at the residence, and the police were not told about the victim's habits regarding out-of-town travel. We do not believe these facts change the outcome.

[33] Further, we disagree with Snow's contention that "the only information available at the time of forced entry into the Lowell residence was a missing person's report." Appellant's Br. p. 20. Niemeyer contacted police after not

hearing from her parents for several weeks. This was especially odd to Niemeyer because—for the first time that she could recall—Clifford and Joyce did not call Niemeyer on her birthday. Niemeyer also spoke with various family members who either reported not hearing from Clifford or Joyce, or who reported that they believed Clifford died. This is information that a daughter would likely be aware of, and hearing it from others certainly was reasonable cause for concern. Niemeyer was also unable to contact Snow. When police reported their observations of the residence to Niemeyer, she indicated something was not right, and it was out of character for her parents to leave the house in disarray. Finally, police were familiar with Snow; they engaged in a pursuit with Snow through a corn field and were unable to locate him. Accordingly, exigent circumstances were present and the officers' entry was permissible. The search was proper under the Fourth Amendment.

## B. *Indiana Constitution*

[34]    Snow also challenges the search as improper under Article 1, Section 11 of the Indiana Constitution. Snow did not initially challenge the search under the Indiana Constitution and has, therefore, waived this argument. Waiver notwithstanding, we will address Snow's argument that allowing the evidence found in the search of the residence constituted fundamental error.[13]

---

[13] Snow argued that the error was not "harmless error" in his initial brief. Snow did not raise the issue of "fundamental error" until his reply brief. Although this is impermissible, we will address this argument. *See* Ind. App. R. 46 ("No new issues shall be raised in the reply brief.").

[35] "An error is fundamental. . . . if it 'made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm.'" *Durden v. State,* 99 N.E.3d 645 (Ind. 2018) (quoting *Knapp v. State,* 9 N.E.3d 1274, 1281 (Ind. 2014)). "These errors create an exception to the general rule that a party's failure to object at trial results in a waiver of the issue on appeal." *Durden,* 99 N.E.3d 645 (citing *Benson v. State,* 762 N.E.2d 748, 755 (Ind. 2002)). The exception is very narrow, and "encompasses only errors so blatant that the trial judge should have acted independently to correct the situation." *Id.*

[36]  The language of Article 1, Section 11 tracks the Fourth Amendment; however, "Indiana has explicitly rejected the expectation of privacy as a test of the reasonableness of a search or seizure." *Litchfield v. State,* 824 N.E.2d 356, 359 (Ind. 2005). Instead, the legality of a search "turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Id.* Reasonableness is determined by balancing: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion imposed by the search; and (3) the extent of law enforcement needs. *Id.* at 361.

[37] Here, the degree of concern that a violation occurred was high. Police were aware of Snow's conduct weeks prior and were already looking for Snow when they went to his home. In doing so, the officers noticed, on several occasions, the newspapers piled in the driveway and the dogs' constant barking in the

window. After reporting this to Niemeyer, she also acknowledged that it was not like her parents to leave the house in disarray.

[38] We also agree with the State that "[t]he immediate safety and well-being of at least two people, Joyce and [Snow] were at stake. The need to ensure Joyce's health [after hearing that Clifford may be deceased] and safety were especially paramount in light of Defendant's crime spree in the preceding days." Appellee's Br. p. 35. Accordingly, law enforcement's need to enter the residence was high.

[39] Finally, we consider the degree of intrusion. There was a significant physical intrusion in that the officers kicked down the door to a private residence. Still, officers did not go through Snow's personal effects, and limited their entry of the residence to ensure no one in the residence was in need of aid. After officers discovered the state of the residence and one of the bodies, the officers exited the residence and properly obtained a search warrant before completing a full search of the residence. Although Snow did live at the residence, the victims, who were the individuals believed to be in need of aid, owned the residence. The officers received no response when they knocked and were left with few options when they believed persons in need of aid to be inside the home. *See Montgomery v. State,* 904 N.E.2d 374, 383 (Ind. Ct. App. 2009) (noting that officers had "reasonable grounds to believe an emergency was at hand, [and officers] were motivated primarily by the intent to give assistance," when they entered the hotel room of the defendant), *trans. denied*.

[40] Balancing these factors leads us to conclude that the search of the residence to determine if Joyce and Clifford were in need of help was proper under the Indiana Constitution. Because we conclude the search was proper under both the United States Constitution and the Indiana Constitution, the admission of the evidence found in the residence was not error, much less fundamental error.[14]

## II. Sufficiency of the Evidence

[41] Snow also challenges the sufficiency of the evidence regarding his murder convictions. When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985)). Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84). "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will

---

[14] Because we find the search was valid, we do not address the issue of whether Snow had standing to challenge the search. In addition, because we find that exigent circumstances existed to justify a warrantless search of the residence, we do not address Snow's argument that Niemeyer could not consent to a search of the residence.

affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

[42]  To convict Snow for murder, the State had to prove that Snow "knowingly or intentionally kill[ed] another human being." Ind. Code § 35-42-1-1. Snow argues there was "no evidence directly linking [Snow] to the murders." Appellant's Br. p. 25. Specifically, Snow contends there was "little if any DNA evidence which would link him to the murders[,]" there was no murder weapon, and no witness could say Snow committed the murders. *Id.* Snow argues that the circumstantial evidence that exists "does not point unerringly to the conclusion that [Snow] committed murder." *Id.* The State responds that murder convictions can be sustained based solely on circumstantial evidence, citing *Blackmon v. State,* 647 N.E.2d 1126, 1128 (Ind. 1995) and *Green v. State,* 587 N.E.2d 1314, 1315 (Ind. 1992). We agree with the State. *See Sallee v. State,* 51 N.E.3d 130, 134 (Ind. 2016) (finding that, even though no fingerprint or DNA evidence linked the defendant to the murder, the other circumstantial evidence was sufficient because "[a] conviction for murder may be sustained on circumstantial evidence alone").

[43]  Snow was living with Clifford and Joyce during the time frame of their murders. Clifford and Joyce were bludgeoned and strangled while sitting in the recliners in the family room. Dennis Roper recalled one instance in which he and Snow were helping Clifford repair the roof of the residence in the spring or summer of 2012. Dennis was on the roof with Snow, and Snow said to Dennis,

"when this [] bastard is dead, all this will be mine." Tr. Vol. II p. 70. There were several checks written on Clifford and Joyce's accounts to Snow and Montgomery after the time it was believed Clifford and Joyce were murdered. Further, Clifford's credit cards were used on several occasions. Both the checks and credit cards were found in the car Snow was driving when he was arrested.

[44] Also, someone attempted to clean and repaint the area where Clifford and Joyce were killed. Snow was seen on video carrying paint into the house on Niemeyer's birthday, when Snow claimed their parents were walking the dogs. Additionally, Snow's fingerprints and name were found on pawn receipts of items that were missing from the residence. Finally, the State presented evidence of different excuses Snow gave for his parents' absence, often without prompting. Snow told neighbors that the septic system broke at the residence and that they should not enter. He also told neighbors that his parents left the country for several weeks, before later telling neighbors that his father died of a heart attack.

[45] The fact that a murder weapon was not found is not determinative. Clifford and Joyce were found approximately one month after the estimated times of their deaths, and the jury reasonably could have concluded Snow had time to discard the murder weapon. Snow's argument is simply a request for us to reweigh the evidence, which we cannot do. Based on the foregoing, there was more than sufficient evidence for the jury to find beyond a reasonable doubt that Snow murdered Clifford and Joyce.

## Conclusion

Because the search was proper under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, we find that the evidence from the residence was properly admitted in Snow's trial. Additionally, sufficient evidence existed for the jury to convict Snow of murder. We affirm.

Affirmed.

Brown, J., and Altice, J., concur.